# Matter of H-G-G-, Respondent

*Decided July 31, 2019*[1]

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
Administrative Appeals Office

For purposes of adjustment of status under section 245 of the Act, a recipient of Temporary Protected Status (TPS) is considered as being in and maintaining lawful status as a nonimmigrant only during the period that TPS is in effect; a grant of TPS does not constitute an admission, nor does it cure or otherwise impact any previous unlawful status.

ON BEHALF OF APPLICANT: Steven C. Thal, Esquire, Minnetonka, Minnesota

The Applicant, a native and citizen of El Salvador, has applied to adjust his status to that of a lawful permanent resident pursuant to section 245 of the Immigration and Nationality Act (the Act), 8 U.S.C. § 1255. The Director of the National Benefits Center, U.S. Citizenship and Immigration Services (USCIS), denied the application, finding that the Applicant had never been inspected and admitted or paroled into the United States and, further, that the Applicant had not continuously maintained lawful immigration status. Sections 245(a) and (c)(2) of the Act. The matter is now before us on certification from the Director. *See* 8 C.F.R. § 103.4(a)(1).

On certification, the Applicant submits a brief as well as one from amicus curiae.[2] The Applicant asserts that his grant of TPS under section 244 of the Act, 8 U.S.C. § 1254a, cures the deficiencies in his application. Specifically, the Applicant claims that pursuant to specific TPS provisions, a grant of TPS satisfies the requirements of both "inspection and admission" as well as the continuous maintenance of lawful immigration status. As a result, he claims he is eligible to adjust his status.

Upon *de novo* review, we will affirm the decision of the Director and deny the adjustment application.

---

[1] On July 31, 2019, U.S. Citizenship and Immigration Services designated this Administrative Appeals Office (AAO) decision as an Adopted Decision.
[2] We appreciate the thoughtful brief submitted by the American Immigration Council in this case.

## I.  BACKGROUND

The facts regarding the Applicant's 28-year presence in the United States are undisputed.  The Applicant entered the United States without inspection and admission or parole in August 1990, was granted TPS in 2003, and has maintained TPS ever since.  USCIS approved a Form I-130, Petition for Alien Relative, which resulted in the Applicant's classification under section 203(a)(3) of the Act, 8

U.S.C. § 1153(a)(3), as the derivative beneficiary of a married son or daughter of a U.S. citizen.[3]  When a visa became available, he filed a Form I-485, Application to Register Permanent Residence or Adjust Status.

It is the Applicant's burden to establish his eligibility for adjustment of status as a derivative of his wife's family-based third preference visa classification.  Section 291 of the Act, 8 U.S.C. § 1361; *Matter of Skirball Cultural Ctr.*, 25 I&N Dec. 799, 806 (AAO 2012).  To do this, the Applicant must satisfy the complex scheme governing adjustment of status by establishing, among other requirements, that he was inspected and admitted or paroled, that none of the bars to adjustment of status applies, and that he merits a favorable exercise of the Secretary's discretion.  Section 245 of the Act; 8 C.F.R. §§ 245.1, 245.2(a)(2).

The Director determined that the Applicant's unlawful entry made him ineligible for adjustment because the Applicant was not inspected and admitted or paroled, and therefore did not satisfy the threshold requirement stated in section 245(a) of the Act.  In addition, the Director found the Applicant barred from adjustment under section 245(c)(2) of the Act, as the Applicant did not continuously maintain lawful immigration status since entry into the United States.[4]

On certification, the Applicant acknowledges that he was not inspected and admitted into the United States when he entered in 1990 and that he did not obtain any type of status until he received TPS in 2003.  He asserts that he is nonetheless eligible to adjust status because section 244(f)(4) of the Act allows a TPS recipient to satisfy the requirement of inspection and admission and to avoid the bar at section 245(c)(2).

Thus, we must consider whether a grant of TPS: (1) constitutes an "admission" into the United States for purposes of adjustment of status under

---

[3]   The Applicant's wife is the married daughter of a U.S. citizen and the Applicant derives through her.

[4]   Not all foreign nationals are subject to the bar in section 245(c)(2), such as a U.S. citizen's "immediate relatives," as that term is defined by section 201(b)(2) of the Act, 8 U.S.C. § 1151(b)(2), or special immigrants described in sections 101(a)(27)(H)-(K) of the Act.  The Applicant is not exempted through either of these categories.  Nor is the Applicant aided by the exemption at section 245(k) of the Act, which is limited to employment-based immigrants.

section 245(a) of the Act, and (2) excuses any failure to continuously maintain a lawful status since entry into the United States for purposes of section 245(c)(2).

## II. LEGAL AND HISTORICAL BACKGROUND

### A. Statute

The Applicant asserts that the plain statutory language permits adjustment of status, and so we begin with that text. Specifically, section 245(a) of the Act states in relevant part:

> The status of an alien *who was inspected and admitted or paroled into the United States* . . . may be adjusted by the [Secretary of Homeland Security], in [her] discretion and under such regulations as [she] may prescribe, to that of an alien lawfully admitted for permanent residence . . . .

8 U.S.C. § 1255(a) (emphasis added). In line with this statutory requirement, the predecessor Immigration and Naturalization Service (INS) amended the regulations at 8 C.F.R. § 245.1(b)(3) to provide that "[a]ny alien who was not admitted or paroled following inspection by an immigration officer" is ineligible to apply for adjustment of status. *Aliens and Nationality; Immigration and Nationality Act Amendments of 1981*, 47 Fed. Reg. 44,233 (Oct. 7, 1982).

Section 245(c)(2) of the Act generally bars adjustment by an alien who failed to continuously maintain a lawful status. In pertinent part, the statute provides:

> [S]ubsection (a) shall not be applicable to . . . an alien (other than an immediate relative as defined in section 201(b) . . . ) . . . who has failed (other than through no fault of his own or for technical reasons) to maintain continuously a lawful status since entry into the United States . . . .

In the Immigration Act of 1990 (IMMACT90), Congress established the TPS regime in what is now section 244 of the Act. *See* Pub. L. No. 101-649, § 302, 104 Stat. 4978 (1990). Section 244 allows the Attorney General (now the Secretary of Homeland Security) to designate for TPS countries that are experiencing natural disasters, armed conflict, or other extraordinary and temporary conditions and allow nationals of such countries to remain lawfully in the United States temporarily with work authorization.

In establishing the TPS regime, Congress provided for extraordinary benefits and protections for covered individuals. For example, during the period in which an individual is in valid temporary protected status, DHS

may not remove such individual and must grant employment authorization. Section 244(a)(1)(A)-(B) of the Act, 8 U.S.C. § 1254a(a)(1)(A)-(B). An alien may be granted TPS even if he or she entered without inspection or lacks lawful immigration status at the time of application. *See* section 244(c)(1)-(2) of the Act, 8 U.S.C. § 1254a(c)(1)-(2) (describing eligibility criteria); *Matter of Sosa Ventura*, 25 I&N Dec. 391, 392 (BIA 2010). Further, an alien granted TPS while in valid nonimmigrant status may continue to maintain that nonimmigrant status while in TPS. Section 244(a)(5) of the Act, 8 U.S.C. § 1254a(a)(5).[5]

For TPS recipients, section 244(f) of the Act deems TPS—solely during the period in which the individual holds TPS—to constitute lawful nonimmigrant status for purposes of the "maintenance of status" requirements for adjustment and change or status:

> During a period in which an alien is granted temporary protected status under this section—
> * * * *
> (4) for purposes of adjustment of status under section 245 and change of status under section 248, the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant.

Thus, during the period in which an individual has TPS, the individual is deemed to be in and maintaining nonimmigrant status for purposes of adjustment and change of status eligibility.[6] By contrast, the provision does not specifically address the entirely separate requirement for adjustment of status under section 245(a) of having been admitted or paroled into the United States. *Cf., e.g.*, section 245(h) of the Act (deeming a grant of special immigrant juvenile status to constitute parole into the United States for purposes of section 245(a)).

---

[5] *See also* Memorandum from Paul W. Virtue, Acting General Counsel, INS to Terrance O'Reilly, TPS Coordinator, INS, *Advance Parole for TPS Eligible Aliens in Deportation Proceedings*, INS Gen. Counsel Op. No. 91-49, slip op. at 3 n.2, 1991 WL 1185160 (June 17, 1991) ("A grant of TPS does not vitiate the lawful status of an alien who has been lawfully admitted as a nonimmigrant.").

[6] In addition to showing that he or she has been admitted or paroled into the United States, an applicant who seeks to adjust status as an employment-based immigrant under section 203(b) of the Act, 8 U.S.C. § 1153(b), also must establish that he or she is "in a lawful nonimmigrant status." Section 245(c)(7) of the Act, 8 U.S.C. § 1255(c)(7). Likewise, to change nonimmigrant status while in the United States, an alien must demonstrate that he or she is "continuing to maintain" lawful nonimmigrant status. Section 248(a) of the Act, 8 U.S.C. § 1258(a). For example, if an F-1 nonimmigrant student was granted TPS while still in her duration of stay in F-1 status, and her duration of stay subsequently expired, the student would not be disqualified for adjustment or change of status because of the expired F-1 status due to the protection provided by section 244(f)(4) of the Act.

B.  Administrative Authorities

The INS General Counsel issued an opinion in March 1991, shortly after enactment of IMMACT90, advising that while section 244(f)(4) permits a TPS beneficiary to maintain adjustment eligibility based on a previous admission in nonimmigrant status, the section should not be construed as meaning that a grant of TPS itself constitutes an admission to the United States. Memorandum from Paul W. Virtue, Acting General Counsel, INS to Jim Puleo, Assoc. Comm'r, Examinations, INS, *Temporary Protected Status and Eligibility for Adjustment of Status under Section 245*, INS Gen. Counsel Op. No. 91-27, 1991 WL 1185138 (Mar. 4, 1991) (1991 Opinion), *incorporated    at    7    USCIS    Policy    Manual    B.2(A)(5)*, https://www.uscis.gov/policymanual.

The Opinion recognized that under section 244(f)(4) of the Act, a TPS recipient would not be barred by section 245(c)(2) of the Act for failure to continuously maintain lawful status *during the period of TPS*.  The Opinion further explained that section 244(f)(4) does not make lawful the TPS recipient's "unlawful presence in the United States prior to the granting of TPS."   The Opinion affirmed that an individual who entered without inspection is barred from adjustment of status by section 245(a) of the Act, "[s]ince an alien who entered without inspection, by definition, cannot satisfy this requirement."[7]  INS Gen. Counsel Op. 91-27 at 2.  The Opinion does not articulate the reasons for this statement, but its phrasing suggests they are self-evident.  While the Opinion implied that section 244(f)(4) did not supply the necessary admission to the United States, it did not squarely examine the text of that unique, *sui generis* provision.

Subsequently, in 1991, the INS published the regulations that govern TPS.  *See generally* 8 C.F.R. pt. 244.  In the course of promulgating the rules, the INS received public comment asserting "that aliens granted TPS should be allowed to adjust status in the United States, regardless of how they entered the United States."  *Temporary Protected Status*, 56 Fed. Reg. 23,491, 23,495 (May 22, 1991).  The INS declined to adopt the proposition, noting Congress did not make any corresponding changes to the statutory requirements for adjustment of status when it enacted the TPS program:

> Section 245(a) provides that, in order to be eligible to adjust, the alien must have been "inspected and admitted or paroled into the United States."  An alien who entered the United States without inspection cannot satisfy this requirement and,

---

[7]    The Opinion also advises that an individual who departs and returns to the United States under advance parole would meet the "paroled into" requirement under section 245(a) of the Act, but this parole—or indeed any subsequent reentry— would not erase the bar to adjustment of status at section 245(c)(2) of the Act.  INS Gen. Counsel Op. 91-27 at 2; *see also* 8 C.F.R. § 245.1(d)(3).

therefore, would not be eligible to adjust. The Service believes the regulations are clear on this point and will not be changed.

56 Fed. Reg. at 23,495.

DHS and its predecessor entities, for almost 25 years, have consistently adhered to this reasonable and long-standing interpretation, except as otherwise required by federal case law. Moreover, the Board of Immigration Appeals (the Board) has shared in DHS' interpretation in a number of instances.[8] As reflected in the USCIS Policy Manual, the Opinion remains the agency's official interpretation of the interplay between sections 244(f)(4) of the Act and 245(a) and (c).

## C. Decisions by U.S. Courts of Appeals

The United States Court of Appeals for the Eighth Circuit, in whose jurisdiction this case arises, has not addressed the issue of whether TPS provides the inspection and admission necessary to adjust status under section 245(a) of the Act.[9] But in the last decade, the Courts of Appeals for the Sixth, Ninth, and Eleventh Circuits have reviewed this question in cases where the alien initially entered the United States without being inspected

---

[8]   We acknowledge that the Board has not addressed this specific issue in a precedential decision. *See, e.g.*, *Matter of Elusme*, A087-357-468 (BIA Sept. 28, 2018) (unpublished); *Matter of Orantes*, A094-060-372 (BIA Dec. 10, 2014) (unpublished); *Matter of Alvarenga-Torres*, A095-010-327 (BIA June 12, 2014) (unpublished); *Matter of Fiallos-Ortiz*, A094-337-673 (BIA Feb. 7, 2013) (unpublished). *But cf. Matter of Sosa-Ventura*, 25 I&N Dec. at 391 (discussing the history of the TPS program and holding that the status only temporarily waives certain grounds of inadmissibility).

[9]   A few district courts have concluded that TPS constitutes an admission for purposes of adjustment of status under section 245(a) of the Act: *Melgar v. Barr,* 379 F. Supp. 3d 783 (D. Minn. 2019); *Rodriguez Solorzano v. Nielsen*, No. 7:17-cv00249 (W.D. Texas Jan 17, 2019); *Sanchez v. Johnson*, No. 16-cv-651 (D.N.J. Dec. 7, 2018); *Velasquez v. Sessions*, No. 18-cv-733 (D. Minn. Nov. 21, 2018); *Figueroa v. Rodriguez*, No. 16-cv-8212, 2017 WL 3575284 (C.D. Cal. Aug. 10, 2017); *Bonilla v. Johnson*, 149 F. Supp. 3d 1135 (D. Minn. 2016); and *Medina v. Beers*, 65 F. Supp. 3d 419 (E.D. Pa. 2014).   We have considered these district court decisions insofar as they are relevant to the questions before us, but they are not binding and hence do not control the outcome here. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("'A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.'") (quoting 18 J. Moore, et al., MOORE'S FEDERAL PRACTICE § 134.02[1][d], p. 134-26 (3d ed. 2011)); *see also Matter of K-S-*, 20 I&N Dec. 715 (BIA 1993) (observing that district court decisions are not binding on the BIA other than in the case before it).

and admitted or paroled, later obtained TPS, and then applied to adjust to lawful permanent resident status as the immediate relative of a U.S. citizen.[10]

Each court concluded that the plain language of the TPS statute alone answers the question of whether a grant of TPS is an inspection and admission for the purpose of section 245(a) of the Act.  *See Ramirez v. Brown*, 852 F.3d 954 (9th Cir. 2017); *Flores v. USCIS*, 718 F.3d 548 (6th Cir. 2013); *Serrano v. U.S. Att'y Gen.*, 655 F.3d 1260 (11th Cir. 2011) (per curiam).  But the courts disagreed about what this *plain* language actually means.

While the Eleventh Circuit determined that the plain text of section 244(f)(4) does not render a grant of TPS an admission for the purpose of adjustment of status under section 245(a) of the Act, the Sixth and the Ninth Circuits reached the opposite conclusion.  The Sixth and the Ninth Circuits stated that their interpretations of the *plain* language were consistent with apparent congressional intent regarding the TPS program.  Noting that TPS recipients constitute a class of individuals whom Congress believed should be accorded temporary protection from return due to extraordinary circumstances, the Sixth Circuit inferred that this designation supports its interpretation of the statute to allow for adjustment of status rather than requiring the individual to return for consular processing.  *See Flores*, 718 F.3d at 554.  And the Ninth Circuit determined that allowing TPS recipients to adjust their status to that of an alien lawfully admitted for permanent residence "comfortably" fits within the program's purpose to provide temporary relief while conditions in their countries render their return unsafe, while the Agency's interpretation would require recipients to return to their country, contravening that purpose.  *See Ramirez*, 852 F.3d at 963-64.

However, in reaching these conclusions, none of the courts examined or discussed the program's history in their respective opinions.

## D.  History of TPS

Prior to the creation of TPS, the Executive Branch employed an ad hoc mechanism known as Extended Voluntary Departure (EVD) to protect classes of foreign nationals who could not safely return to their countries of origin due to events that had arisen since their arrival in the United States. Starting with Cubans during the Eisenhower Administration, the Executive

---

[10]  In the Sixth, Ninth, and Eleventh Circuits, due to the petitioners' status as immediate relatives of U.S. citizens, the section 245(c)(2) bar was not implicated in those cases.  It appears that no federal court has addressed the 245(c)(2) bar in conjunction with 244(f)(4).

used EVD almost continuously in various circumstances.[11]  These exigencies were not covered by the asylum laws, which extend protections only to individuals targeted for persecution on account of their race, political opinion, or other protected characteristics.  *See* section 208 of the Act, 8 U.S.C. § 1158.

Congress, while appreciative of the Executive's humanitarian actions, expressed grave concerns regarding the tenuous statutory basis for EVD and the lack of accompanying eligibility and procedural standards, including the tracking of recipients for purposes of effectuating their departure at the conclusion of their EVD.  *See* H.R. Rep. No. 101-245, at 12 (1989) ("The [former] INS cannot effectuate the dep[o]rtation of aliens whose EVD status has expired, since it does not monitor those aliens' whereabouts.").

In addition to these overarching congressional concerns, two events in the late 1980s drove the perceived need for a TPS-type program: the long running civil war in El Salvador and the precipitous events in China that followed the Chinese Government's suppression of protests in Tiananmen Square.  The genesis of section 244(f)(4) of the Act can be traced to congressional concern for the welfare of Chinese nationals, particularly nonimmigrant students who were lawfully present in the United States in the aftermath of Tiananmen Square and, as a result, were viewed with suspicion by the Chinese government.

Although EVD had been implemented to protect eligible Chinese nationals, Congress recognized that conditions in China were unlikely to allow many to return before the expiration of their lawful immigration status.  As a result, members of Congress proposed legislation to preserve their immigration status quo during the EVD period through the "Chinese Temporary Protected Status Act of 1989" (CTPS Act), which specified that a Chinese national with valid status need not relinquish it to receive protection under its provisions.  *See* H.R. 2929, 101st Cong. (1989).  Although never enacted, the CTPS Act would have provided for relief that is similar to what later became TPS as it contemplated only temporary protection; it did not have provisions for adjustment or other permanent regularization of status.[12]  And significantly, CTPS had a provision identical to section 244(f)(4) of the Act.

---

[11]  In testimony on October 28, 1987, an INS Associate Commissioner testified about the long list of groups given EVD, starting in 1960 with Cubans in the wake of the Cuban revolution, and ending with Polish nationals in 1987.  H.R. Rep. 101-245 at 10 (1989).

[12]  Congressional efforts culminated in the enactment of the Chinese Student Protection Act (CSPA), Pub. L. No. 102-404, 106 Stat 1969 (1992).  The CSPA directly provided for adjustment of status and included a specific provision waiving the bars at section 245(c).  *See id*. § 2(a)(5).  A comparison with TPS demonstrates that the benefits provided by section 244(f)(4) of the Act are considerably less advantageous than those under the CSPA.

Debate over extending humanitarian protection to at-risk foreign nationals featured prominently in the overall congressional deliberations that ultimately led to the passage of the Immigration Act of 1990. While the Senate concerned itself primarily with Chinese nationals, the House of Representatives focused on protections for nationals of El Salvador and other countries experiencing internal strife at that time, such as Liberia and Kuwait. Following conference between the House and Senate, the resulting legislation created the TPS program.[13] Pub. L. No. 101-649, § 302, 104 Stat. 4978 (Nov. 29, 1990).

The legislative history of TPS not only reflects a desire for humanitarian protection, but also emphasizes its temporary nature and the standardized process for granting and ultimately terminating such protection. A Senate Conference Report sets forth the congressional purpose. For example, noting that few nationals of El Salvador were receiving asylum despite the civil strife in their native country, Senator DeConcini said:

> [N]ationals of El Salvador who have been continuously present in the United States since September 19, 1990, would be granted [TPS] for 18 months . . . . Such a registration system provides a means by which the United States can maintain accurate records of Salvadorans in this country while at the same time provide them with safe haven. In addition, it will facilitate the return of Salvadorans when the period of temporary protected status expires.

136 Cong. Rec. S17106-01, S17108, 1990 WL 165401 (Conf. Rep.). With respect to a path to permanent residence, the Senator emphasized:

> [T]his legislation is not a substitute for political asylum. This bill would not grant permanent resident alien status. . . . What this bill will provide is a *temporary safe haven* in the United States until conditions in El Salvador are such that refugees *may return to their home country* safely.

*Id*. at S17108-09 (emphasis added).

## III. ANALYSIS

At the outset, we acknowledge the contrary judicial authority and respectfully disagree with the courts that have interpreted section 244(f)(4) of the Act in a manner inconsistent with long-standing USCIS and INS

---

*See* INS Gen. Counsel Op. 93-59, 1993 WL 1504006, at 2 (Aug. 17, 1993), *incorporated at* 7 USCIS Policy Manual B.2(A)(5).

[13] Congress did, however, strongly urge the Administration to extend TPS to those countries and stated its expectation that the EVD for Chinese would be extended until 1994. *See* 1990 U.S.C.C.A.N. 6784, 6792.

policy. Furthermore, we are mindful of the humanitarian considerations that may influence DHS's TPS determination for a foreign country. However, neither the contrary judicial opinions nor the sympathetic humanitarian circumstances persuade us that USCIS, and its predecessor INS, have decided this question incorrectly as a matter of law.

## A.  Statutory Text

"Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id*. at 341. We are required to apply the plain language of the Act, avoiding the creation of ambiguity where none exists. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" (citations omitted)).

We begin with the language of section 245 of the Act, the operative statute by which the Applicant seeks to achieve lawful permanent residence. Section 245(a) of the Act unambiguously authorizes the Secretary of Homeland Security to adjust the "status of an alien *who was inspected and admitted or paroled into the United States* . . . to that of an alien lawfully admitted for permanent residence." (Emphasis added.)

In turn, section 244(a) of the Act provides that an alien who is granted TPS is not subject to removal "from the United States during the period in which such status is in effect," is authorized to engage in employment in the United States, and is provided documentation of that authorization. Section 244(f)(4), in pertinent part, provides that "[d]uring a period in which an alien is granted temporary protected status . . . for purposes of adjustment of status under section 245 . . . *the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant*" (emphasis added).

On its face, section 244(f)(4) of the Act does not provide for the inspection, admission, or parole of an alien, as the terms are entirely absent. *See Dean v. United States*, 556 U.S. 568, 572 (2009) (declining to "'read[] words or elements into a statute that do not appear on its face'" (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997))). Instead, the use of the phrase "considered as being in and maintaining" lawful status serves as implicit recognition that the individual is not in fact in such status. We observe that section 244(f)(4) does not confer actual nonimmigrant status—

as amicus curiae has acknowledged—and says nothing about retroactive application.

Consequently, we agree with the INS' original statutory justification for refusing to allow aliens granted TPS to adjust status in the United States, "regardless of how they entered the United States." 56 Fed. Reg. at 23,495. As observed in 1991, Congress did not amend the statutory requirements for adjustment of status when it enacted the TPS program—the alien must still have been inspected and admitted or paroled into the United States. And in accord with the plain language of section 244(f)(4), TPS does not waive or make lawful the recipient's "unlawful presence in the United States prior to the granting of TPS." INS Gen. Counsel Op. 91-27 at 2.

Based on the plain language of the statute, we conclude that section 244(f)(4) of the Act does not confer a broad remedy for prior immigration violations, but instead serves a limited and specific purpose: it maintains the status quo, ensuring that individuals who maintained a lawful immigration status prior to TPS are not penalized if that status expires during the time in which they are in TPS. *See Guerrero v. Nielsen*, 742 F. App'x 793, 797 (5th Cir. 2018) (rejecting assertion that section 244(f)(4) "'unambiguously' permits TPS-holders to adjust their status 'regardless of prior manner of entry,'" since "that is not what the statute says. Instead of offering TPS-holders carte blanche to become lawful permanent residents, [section 244(f)(4)] extends to them the more narrowly-crafted benefit of 'lawful status as a nonimmigrant'"). This allows applicants who are otherwise eligible to adjust status, but whose original nonimmigrant status lapsed during the period of their TPS, to avoid the bar prescribed at section 245(c)(2) of the Act for failure to maintain continuously their lawful nonimmigrant status since entry into the United States.

This limited exemption comports with the statute's text, and with the humanitarian purpose of the TPS program, by preserving the legal status of those individuals who never violated the immigration laws, but who would have lost their original nonimmigrant status if they remained in the United States due to circumstances beyond their control.

Stated another way, the plain interplay of the statutory provisions ensures that those who were eligible to adjust their status before receiving TPS remain so; it does not mean that persons ineligible for adjustment due to prior immigration violations have that ineligibility waived by a grant of TPS. The plain language of the statute does not reflect any intent to confer advantages to those persons without lawful status beyond providing temporary protection from removal; instead, it is clear that Congress sought an orderly departure regime. "TPS does not create an admissions program. It is designed to protect individuals already in the United States and gives no alien

any right to come [to] the United States." *Matter of Sosa-Ventura*, 25 I&N Dec. at 394 (internal citation omitted).

Although congressional silence is not always determinative, we find that it nonetheless "is clear that Congress had an intention on the precise question at issue." *Negusie v. Holder*, 555 U.S. 511, 518 (2009); *see Annachamy v. Holder*, 733 F.3d 254, 260 (9th Cir. 2013) ("Although silence is certainly not conclusive as to whether an exception exists, the statutory framework makes clear that no exception was intended.") (citations omitted).  If Congress intended to deem a grant of TPS to constitute an admission or parole for adjustment or change of status purposes, it could have included language akin to that of section 245(h)(1), clarifying that a special immigrant juvenile (SIJ) "shall be deemed, for purposes of subsection (a) of [section 245], to have been paroled into the United States."[14]  8 U.S.C. § 1255(h)(1); *see I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))); *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) (observing that "[h]ad Congress instead intended in [section 202(a)(1)(A) of the Act, 8 U.S.C.] § 1152(a)(1)(A) to constrain the President's power to determine who may enter the country, it could easily have chosen language directed to that end," as Congress had done in other provisions).

Moreover, the Department's long-standing reading of section 244(f)(4) is entirely compatible with the statutory scheme.  In providing for certain protections relating to adjustment or change of status, Congress may well have been most concerned with aliens who already had been admitted (e.g., in nonimmigrant status) rather than those who had entered without inspection.[15]  In a similar context, the Ninth Circuit Court of Appeals upheld

---

[14]  Congress established the SIJ status in the same legislation in which it created the TPS regime, IMMACT90.  The next year, Congress added the "deeming" language in section 245(h)(1) to eliminate a barrier to adjustment of status for children granted SIJ status. *See* Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 302.  Congress, however, did not similarly amend the TPS provisions notwithstanding its presumed awareness of INS's contemporaneous interpretation as evidenced in the 1991 General Counsel opinion and the 1991 implementing regulations.

[15]  Indeed, the legislative history of section 244(f)(4) bears evidence of such a policy focus. Section 244(f)(4) has its origins in section 3 of the Emergency Chinese Immigration Relief Act of 1989 (ECIRA), H.R. 2712, 101st Cong., 1st Sess. (1989). In July 1989, a month or so after ECIRA was introduced, the Chinese Temporary Protected Status Act of 1989 (Chinese TPS Act) was introduced, containing the precise language now reflected in section 244(f)(4). *See* H.R. 2929, § 2(a), 101st Cong., 1st Sess. (1989). The focus of both

the former INS's interpretation of a similar provision in the Chinese Student Protection Act of 1992 (CSPA), Pub. L. No. 102-404, 106 Stat. 1969, in which Congress exempted covered Chinese nationals from certain adjustment of status requirements but did not expressly waive the "inspected and admitted and paroled" requirement. *Yu Xian Tang v. Reno*, 77 F.3d 1194, 1197-98 (9th Cir. 1996) (construing CSPA § 2). There, the court observed that in so limiting the scope of the CSPA provisions facilitating adjustment of status, Congress reasonably focused on individuals who had lawfully entered.

The absence of language expressly deeming a TPS grant to constitute an admission or parole for adjustment or change of status purposes therefore is telling. Even assuming *arguendo* that the statute is "silent" on the issue, that silence should not be interpreted as requiring a particular result even if such a result would generally promote humanitarian aims. *See Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2019 (2012) ("We cannot read a silent statute as requiring (not merely allowing) imputation year just because that would be family friendly."). Congress itself has not sought to "correct" the agency's construction of section 244(f)(4), which DHS and the former INS have held for nearly 30 years. Although Congress, since 1991, has amended section 245(a) and enacted certain provisions to exempt certain populations from the "inspected and admitted or paroled" requirement,[16] it has not done so with respect to aliens with TPS notwithstanding the agency's long-standing, contemporaneous interpretation.

### 1. "Whole Statute" Interpretation Confirms that TPS is not an Admission

Adopting an interpretation that TPS is an "admission" for purposes of section 245(a) of the Act, as the Applicant proposes, would have us read the

---

ECIRA and the Chinese TPS Act, both proposed in the wake of the events in Tiananmen Square, was to protect Chinese nationals who were lawfully present in the United States. Congress later enacted the Chinese Student Protection Act of 1992 (CSPA), Pub. L. No. 102-404, 106 Stat. 1969. While the CSPA exempted covered Chinese nationals from certain eligibility requirements for adjustment of status, it did not do so with respect to the "inspected and admitted or paroled" requirement. *See Yu Xian Tang v. Reno*, 77 F.3d 1194, 1197-98 (9th Cir. 1996). "The CSPA contains *express* exemptions from several standard immigration provisions . . . . Noticeably absent from this list is any mention of § 245(a), and we decline Lin's invitation to read into the CSPA an exemption that Congress failed to include." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995).

[16] For example, in 2000, Congress amended section 245(a) to exempt Violence Against Women Act (VAWA) selfpetitioners from the "inspected and admitted or paroled" requirement. *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, § 1502; *see also* section 101(a)(51) of the Act, 8 U.S.C. § 1101(a)(51) (defining "VAWA self-petitioner").

TPS statutory provisions at section 244(f) of the Act as negating or cancelling out the threshold requirements and statutory bars for adjustment of status under section 245 of the Act. However, the "ordinary assumption" is "that Congress, when drafting a statute, gives each provision independent meaning." *Torres v. Lynch*, 136 S. Ct. 1619, 1628 n.8 (2016). Accordingly, we are instructed to "'interpret the statute as a symmetrical and coherent regulatory scheme'" and "to fit, if possible, all parts into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 103 (2012) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). "[W]e must, as usual, 'interpret the relevant words not in a vacuum, but with reference to the statutory context.'" *Torres*, 136 S. Ct. at 1626 (quoting *Abramski v. United States*, 573 U.S. 169, 134 S. Ct. 2259, 2267 (2014)).

If two statutory provisions touch on the same topic, we must, if possible, read them so as to give effect to both, unless the text or legislative history of the later statute indicates otherwise. We do not construe the provisions in isolation, but must read them in the context of the entire scheme of the Act so that the whole may be harmonized and retain effectiveness. *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 574-75 (1995) (providing that when interpreting a statute, one should avoid a reading that renders words altogether redundant). Furthermore, we are guided, when reading the statute as a whole, by prefatory language existing in the statute, which in in this case provides a temporal scope for each of the parallel phrases set forth in section 244(f) of the Act. *Cf. Parm v. Nat'l Bank of Cal., Nat'l Ass'n*, 835 F.3d 1331, 1336 (11th Cir. 2016) (noting that "[w]hen the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies to only the nearest reasonable referent").

Following these fundamental principles, we do not agree with the *Flores* and *Ramirez* courts that section 244(f)(4) of the Act, by its plain language, means that TPS recipients satisfy the requirements for inspection and admission or parole, or for maintenance of lawful status, under sections 245(a) and (c)(2) of the Act respectively. *See Ramirez*, 852 F.3d at 964 (holding that section 244(f)(4) of the Act provides that a TPS recipient is considered "inspected and admitted" under section 245(a) of the Act); *Flores*, 718 F.3d at 554 (holding that section 244(f)(4) of the Act provides that a TPS recipient is considered being in lawful nonimmigrant status and thus meets the three requirements in section 245(a) of the Act). To the contrary, the plain and unambiguous language of the statute indicates that the lawful-status benefit for TPS grantees set forth in section 244(f)(4) of the Act applies only to the time period in which an alien has TPS. The prefatory phrase "during a period in which an alien is granted temporary protected status" is a temporal qualifier for the lawful-status benefit under section 244(f)(4).

Unlike the Eleventh Circuit in *Serrano*, both the *Flores* and *Ramirez* courts minimized or departed from the actual "inspected and admitted" and "continuous maintenance of lawful status" language of section 245 and instead took recourse in their theories of the intent underlying the TPS provisions. We respectfully disagree with the *Flores* and *Ramirez* courts as they reach an interpretation that is foreclosed by clear congressional intent.

Conversely, the *Serrano* court's conclusion—that "[t]he plain language of [section 245(a)] limits eligibility for status adjustment to an alien who has been inspected and admitted or paroled"— reads the statutory provisions in a manner that preserves the statutory scheme and leaves the threshold requirements of section 245(a) and the bars to adjustment unaffected.[17] *Serrano*, 655 F.3d at 1265; *see Husted v. A. Philip Randolph*, 138 S. Ct. 1833, 1842 (2018) ("If possible, 'we must interpret the statute to give effect to both provisions[.]'" (quoting *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009))).

### 2. The Legislative History Supports Conclusion that TPS Prevents Removal and Does Not Confer an Admission

Again, the rules of statutory construction compel us to consider the design of the statute as a whole. *K Mart Corp.*, 486 U.S. at 297. In doing so, we find it instructive to examine the legislative history and its role in the Act. Such statements can be "helpful to corroborate and underscore a reasonable interpretation of the statute." *Matter of Punu*, 22 I&N Dec. 224, 226-27 (BIA 1998) (citing *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982)).

While the Applicant asserts broadly that Congress intended to permit adjustment of status for those not otherwise eligible for it, this argument is directly contradicted by the legislative history, the declared objective, and the distinct features of section 244(f) of the Act, all of which underscore the transitory nature of TPS.

In contrast with other humanitarian provisions, the legislative history evidences a concern only for facilitating TPS recipients' orderly departure from the United States, not their ability to remain after their status terminates. *See, e.g.*, 136 Cong. Rec. at S17108-09; H.R. Rep. No. 101-245 at 12. The Applicant has not established, and we are not aware of, any specific

---

[17] The court in *Flores* and certain others, such as the district court in this jurisdiction, distinguished *Serrano* without analysis, finding it "crucial" that the foreign national in that case had not disclosed his unlawful entry, while the applicants in their cases had done so. 718 F.3d at 555; *see also Bonilla*, 149 F. Supp. 3d at 1141. As the Ninth Circuit in *Ramirez* observed, however, that distinction "has no bearing on the Eleventh Circuit's conclusion that [section 244(f)(4)] does not override [section 245(a)]'s threshold 'inspected and admitted' requirement." 852 F.3d at 959. Importantly, the Eleventh Circuit has not departed from its reasoning in *Serrano* in the ensuing seven years. *See Duron v. Stul*, 724 F. App'x 791 (11th Cir. 2018).

indication that Congress intended to afford foreign nationals who unlawfully entered the United States with favored immigration status beyond temporary protection.

Looking beyond section 244(f)(4) of the Act to other provisions of the statute, we conclude that TPS, by its nature, does not create a path to permanent residence. For example, section 244(f)(1) of the Act specifies that, during the period in which a foreign national is granted TPS, he or she "shall not be considered to be permanently residing in the United States under color of law." And section 244(h) of the Act, titled "Limitation on Consideration in the Senate of Legislation Adjusting Status," requires a special act of Congress to permit TPS recipients as a class to adjust status to that of a lawful permanent resident.[18] While the legislative history is silent on the reasons for the addition of section 244(h), it is clear that Congress intended to sharply limit its own ability to afford TPS recipients with permanent resident status in the United States. Section 244, as a whole, and section 244(f) and (h) in particular, demonstrate that Congress intended, in general, that most TPS recipients who entered unlawfully would be ineligible to adjust under section 245 of the Act, but also intended to preserve eligibility for those who entered lawfully.

The limited scope of the TPS benefit is further reflected in the requirements of periodic review, extension, and eventual termination of a country's designation for TPS, which are laid out in section 244(b)(3) of the Act. When the conditions in a designated country no longer meet the requirements for designation, TPS is terminated, and protection from removal ceases. Those individuals who were in unlawful status before receiving TPS are expected to return to their home countries, or revert to their initial unlawful status if they do not. *See generally Matter of Sosa-Ventura*, 25 I&N Dec. at 3945 (setting forth the history of the TPS program and concluding that "Congress clearly did not intend for TPS to create a permanent immigration status in the United States"). This temporary permission to remain and work in the United States for humanitarian reasons, irrespective of one's immigration status before TPS, with the expectation of a later departure when conditions improve, is the hallmark of the TPS framework. *See id*. at 393-95.

By contrast, the differences between TPS and the CSPA illustrate that, when Congress intends to create a means to adjust status for humanitarian reasons, it does so explicitly. When Congress enacted CSPA in 1992, it

---

[18]  Specifically, this provision restricts the Senate from considering any bill, resolution, or amendment that would provide for adjustment to lawful temporary or permanent status for TPS recipients, and further provides that this bar may not be waived or suspended absent a vote of three-fifths of the Members.

specifically waived the bars contained at 245(c) of the Act in clear and unambiguous language. *See* Pub. L. No. 102-404, § 2(a)(5) ("Section 245(c) of such Act shall not apply.").[19]  In addition to CSPA, other provisions in the Act reflect clear congressional intent to cure some or all of a foreign national's ineligibilities under section 245.  For example, section 245(g) and (h) of the Act explicitly state that foreign nationals under those provisions are "deemed . . . to have been paroled into the United States."  And section 245(i)(1) of the Act explicitly waives section 245(a) and (c).

We recognize that the court in *Ramirez* rejected this argument, observing that these provisions were enacted after the creation of TPS, and further noting that there was no requirement that Congress "draft an elegant statute." 852 F.3d at 963.  While true, "'[w]e assume that Congress is aware of existing law when it passes legislation[.]'"  *Hall v. United States*, 566 U.S. 506, 516 (2012) (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990)).   When Congress enacted the CSPA, it understood that TPS recipients under section 244 enjoyed no similar provisions waiving the section 245(c) bars or deeming them to be paroled.

### 3. Section 244(f)(4) Does Not Confer Lawful Immigration Status

The Applicant also advances a more technical interpretation reached by the *Flores* and *Ramirez* courts.  Specifically, the Applicant asserts that, by operation of section 244(f)(4) of the Act, he satisfies the eligibility requirements provided at section 245, including the threshold requirements of inspection and admission at section 245(a) as well as the inapplicability of the various bars at section 245(c).

Like the *Flores* and *Ramirez* courts, the Applicant and amicus curiae maintain that "being in" nonimmigrant status means that an individual must have been inspected and admitted, because an individual must necessarily have been admitted in order to "be in" nonimmigrant status under the requirements of section 214(a)(1) of the Act, 8 U.S.C. § 1184(a)(1).  *See Ramirez*, 852 F.3d at 960 ("[B]y the very nature of obtaining lawful nonimmigrant status, the alien goes through inspection and is deemed 'admitted.'").

The Applicant asserts that a grant of TPS is an entry, inspection, and admission, as evidenced by the Form I-94, "Arrival/Departure Record," that he received when his TPS application was approved.  He further states that, as a result of this new "entry," any prior unlawful entry or unlawful presence—or any other inadmissibility issue—was waived when his TPS was approved.  But the notion that a grant of TPS is an entry or admission is contradicted by the statute, which requires an applicant to be physically

---

[19]  *See also supra* notes 13-15 and accompanying text.

present in the United States in order to seek TPS.  Section 244(c)(1)(A)(i) of the Act; 8 C.F.R. § 244.2(b); *see also* section 244(c)(5) of the Act (providing that "nothing in [the TPS statute] shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for [TPS]").[20]  "We simply will not read into an unambiguous statutory requirement an exception that converts [the TPS] statute into a program of entry for an alien." *De Leon Ochoa v. Att'y Gen. of U.S.*, 622 F.3d 341, 353-54 (3d Cir. 2010).

We do not agree with the Applicant's claim that the court in *Flores* found the issuance of the Form I-94 as persuasive evidence that USCIS considers a grant of TPS to be equivalent to an admission.  In fact, the court in *Flores* expressly declined to address the relevance of the Form I-94, as "the plain language of the statute answers the question."  718 F.3d at 554 n.3; *see also Matter of Castillo-Padilla*, 25 I&N Dec. 257, 261-62 (BIA 2010) (looking to the description on the face of the Form I-94 to conclude that it did not establish that the foreign national was granted parole).

We are not persuaded by the Applicant's claim that section 244(f)(4) of the Act confers lawful nonimmigrant status and thus equates the date he was granted TPS to a date of "inspection and admission" for adjustment purposes. We also disagree with the similar claim advanced by amicus curiae, who asserts that a TPS recipient should be deemed to be a person with valid nonimmigrant status and therefore also considered to have been admitted (and consequently should not be required to demonstrate that he or she was, in fact, admitted).

We discern no basis for either of the two suppositions and conclude the Applicant's interpretation is foreclosed by the plain language of the statute, as well as the statutory scheme, legislative history, and purpose of TPS. While it is true that inspection and admission generally lead to lawful immigration status, it does not follow that having a lawful status results in one's inspection and admission. *See Matter of Castillo-Angulo*, 27 I&N Dec. 194, 200 (BIA 2018) (citing section 212(a)(7) of the Act, 8 U.S.C. § 1182(a)(7), to conclude that, "[w]hen an alien seeks admission at the border, an immigration official admits the alien only upon a determination that he or she is lawfully entitled to enter the United States"); *see also* section 235(a)(3) of the Act (requiring all applicants for admission to be inspected).  For

---

[20]  The term "entry" was previously defined as the "coming of an alien into the United States, from a foreign port or place or from an outlying possession" in section 101(a)(13) of the Act. *See Matter of Agour*, 26 I&N Dec. 566, 571-72 (BIA 2015).  In 1996, Congress replaced the definition of "entry" with the terms "admission" and "admitted," which were first defined by section 301 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-575.

example, a grant of asylum places the individual in valid immigration status but is not an "admission." *Matter of V-X-*, 26 I&N Dec. 147 (BIA 2013). And a grant of benefits under the Family Unity Program confers a "status" for immigration purposes, but does not constitute an "admission." *Matter of Fajardo Espinoza*, 26 I&N Dec. 603 (BIA 2015).

The court in *Ramirez* notes that the terms "admitted" and "admission" cover more than inspection and admission at a port of entry, as the language in the definition at section 101(a)(13)(A) of the Act might otherwise suggest. *See Ramirez*, 852 F.3d at 960-961 (citing cases). But while an "admission" may extend beyond a customary entry into the United States with a valid visa, alternative constructions of this term occur in the context of adjustment of status to place those who adjust status from within the United States into the same position as those who are "lawfully admitted for permanent residence," as defined at section 101(a)(20) of the Act.

Such a construction is reasonable, and necessary to avoid absurd results. *Fajardo Espinoza*, 26 I&N Dec. at 607; *see also Matter of Rosas-Ramirez*, 22 I&N Dec. 616, 621 (BIA 1999) (noting that if a foreign national who entered without inspection and later adjusted to lawful permanent resident status was not deemed admitted, then he or she would remain susceptible to removal under the Act as an alien present without having been admitted or paroled). On the other hand, no bizarre or absurd results are created when we say that an individual who has been granted temporary lawful status—a status that is only effective for limited periods and purposes—has not been "admitted' by virtue of obtaining that status while present in the United States. *See Matter of Reza*, 25 I&N Dec. 296, 299 (BIA 2010).

The Ninth Circuit was also persuaded by the claim that the TPS application and review process, which includes nationality, identity, and admissibility requirements, was sufficiently rigorous and similar to an inspection to be considered an admission. *See Ramirez*, 852 F.3d at 960. However, we are not swayed by the fact that the adjudication of an individual's application for TPS involves an assessment of the relevant eligibility factors. The commonality of factors, without more, does not equate TPS with being "admitted," as many immigration benefit adjudications involve a similar inquiry.

And while the definition of "admission" is not inflexible of meaning, to suggest that it encompasses the adjudication of applications for explicitly temporary immigration benefits would stretch that definition too far. The definition at section 101(a)(13)(A) of the Act is limited in scope and specifically requires the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *See generally Burgess v. United States*, 553 U.S. 124, 130 (2008) (concluding that where

Congress expressly defines a statutory term, that definition "excludes any meaning that is not stated" (quotation marks omitted)).

## B. Narrow Interpretation is Appropriate

Looking at the structure of the statutes, both the Ninth and Sixth Circuits considered it significant that section 244(f)(4) speaks to "purposes of adjustment of status under section 245" and does not delimit its impact to only section 245(c)(2). Both courts noted that Congress could have so drafted it if desired. Observing that the title of section 245 of the Act is "Adjustment of status of nonimmigrant to that of person admitted for permanent residence," the *Ramirez* court found that this language was echoed in section 244(f)(4), which specifies that persons with TPS should be considered in "lawful status as a nonimmigrant," and then inferred that this similarity signaled congressional intent that TPS recipients could avail themselves of section 245 to adjust their status. *See Ramirez*, 852 F.3d at 961.

While the court in *Ramirez* commented that a narrower interpretation "does not leave [section 244(f)(4)] to do much work," *id*. at 962 n.3, we believe that limited reach is exactly what Congress intended: limiting operation of that provision to the requirement of continuous maintenance of lawful status, as provided at section 245(c)(2), so as not to disadvantage foreign nationals who could otherwise fall out of their lawful status while under TPS.[21]

While it is true that section 244(f)(4) refers to section 245 generally, section 245 includes a long list of various requirements, including those of inspection and admission or parole, and of maintaining continuous lawful immigration status. Section 244(f)(4) does not waive all the requirements of section 245; it only speaks to maintaining lawful status while under TPS. And while the TPS provisions do in fact plainly allow for those with that status to adjust under section 245 if they otherwise meet the statutory requirements, neither the language of section 244(f)(4) nor the legislative history of TPS suggests that Congress had any intent to waive the

---

[21] DHS statistics indicate that in fiscal year 2016 alone, a total of 238,087 preference aliens were admitted as lawful permanent residents. *See* Table 6. Persons Obtaining Lawful Permanent Resident Status by Type and Major Class of Admission: Fiscal Years 2014 to 2016, *available at* https://www.dhs.gov/immigration-statistics/yearbook/2016/table6. So with respect to the potential pool of preference aliens, *see* sections 203(a)-(b) of the Act, section 244(f)(4) may have plenty of work to potentially do, to the extent that there are non-immediate relative TPS recipients who are seeking to adjust their status under section 245(a). *See Duron v. Stul*, *supra* (involving non-immediate relative); *Barralaga v. Akins*, No. 17-cv21582, 2018 WL 2187687 (S.D. Fla. Jan. 8, 2018) (involving non-immediate relative).

requirements of lawful admission and maintenance of lawful status for those who did not meet them in the first instance.

Even though a TPS recipient is considered to be in lawful status, the nature of that person's unlawful entry remains unchanged. *See Serrano*, 655 F.3d at 1265 ("That an alien with [TPS] has 'lawful status as a nonimmigrant' for purposes of adjusting his status does not change [section 245(a)]'s threshold requirement that he is eligible for adjustment of status only if he was initially inspected and admitted or paroled."). And section 244(f)(4) says nothing about retroactively transforming prior unlawful status into lawful status.

The Applicant claims that USCIS has argued elsewhere that section 244(f)(4) of the Act waives section 245(c) for all TPS recipients, pointing to the U.S. District Court decision in *Bonilla v. Johnson*, 149 F. Supp. 3d at 1140 (concluding that an alien who enters the country without inspection, admission, or parole, but who is subsequently granted TPS, is eligible to adjust status provided that all other eligibility criteria are met). However, in addition to *Bonilla* being non-precedential because it is a district court case,[22] it also does not support the Applicant's characterization of the agency's position. To the contrary, the Government's position in *Bonilla* appears consistent with the long-standing USCIS and INS interpretation. *See* Motion for Judgment as a Matter of Law at 16, *Bonilla v. Johnson*, *id*. ("The TPS statute only addresses one bar – maintenance of lawful status – to the exclusion of others. That is, Congress eliminated this bar with respect to 'inspected and admitted or paroled' aliens who were subsequently granted TPS, as [sections 244(f)(4) and 245(c)(2) of the Act] contemplate. It did not eliminate the rest of [section 245(c)(2)], . . . nor did it affect any other provisions of [section 245(c)].").[23]

Accordingly, we conclude that while the text of section 244(f)(4) addresses adjustment of status under section 245 generally, its operation is limited to curing unlawful status that accrues only during the period of TPS. We find nothing in the statutory scheme or the legislative history to suggest that Congress intended to also confer new eligibilities on those who did not have them in the first place.[24] Indeed, the statutory framework and legislative history contain a significant amount of evidence to the contrary.

---

[22] *See Camreta v. Greene*, *supra*; *Matter of K-S-*, *supra*.

[23] Moreover, no finding or conclusion in *Bonilla* can be conclusive in this case, as the doctrine of nonmutual collateral estoppel does not apply to the Government. *United States v. Mendoza*, 464 U.S. 154 (1984).

[24] This interpretation is not weakened by the fact that section 245(c)(2) does not apply to aliens who are the "immediate relatives" of U.S. citizens under section 201(b)(2)(A) of the Act, so that section 244(f)(4) would not benefit such an individual independently. That the immigration laws provide greater flexibilities to the immediate relatives of U.S. citizens is

## C. No Absurd Results

In application, our reading means that an individual who was inspected and admitted in a nonimmigrant status, but who failed to maintain that status subsequent to obtaining TPS, can satisfy section 245(a) of the Act and avoid the bar at 245(c)(2).

The Applicant, however, is not such an individual because he initially entered the United States without inspection. Consequently, even if he were to be deemed to have been "admitted or paroled" based on an erroneous reading of section 244(f)(4), the section 245(c)(2) bar for failure to continuously maintain lawful status since the initial entry into the United States would still apply due to the period of time in unlawful status prior to being granted TPS, making him ineligible to adjust status. *See* 8 C.F.R. § 245.1(b)(6), (d)(3) (providing that the departure and subsequent reentry of a foreign national who has at any time failed to maintain a lawful immigration status on any previous entry into the United States does not erase the bar at section 245(c)(2) of the Act); *see also* 7 USCIS Policy Manual B.4(D) (providing that the violation is not required to have occurred during any particular period of time). For these reasons, USCIS counts any violation that occurs after any entry into the United States. This may include violations that occur after the applicant files the adjustment application. *See* 7 USCIS Policy Manual B.4(G). It does not matter how much time has passed since that entry or whether the person subsequently left the United States and returned lawfully.

We acknowledge that an individual—like the Applicant—may have accrued a lengthy residence and related equities in the United States, but these personal considerations are not part of the precise statutory question we resolve in this decision. Any individual who entered without inspection and admission or parole generally would be ineligible for adjustment of status under section 245(a), and any individual who failed to continuously maintain a lawful status despite some period of lawful status during his or her stay in the United States would normally be barred under section 245(c) from adjusting status under section 245(a). Thus, we perceive no absurd result.

---

reasonable, and the overlap here coincidental. The fact remains that the interplay of section 244(f)(4) and section 245 in general, and section 245(c)(2) in particular, serve to ensure that persons with lawful immigration status who obtain TPS are not disadvantaged by doing so.

### D.  Even Assuming Some Ambiguity in Section 244(f)(4), the Provision is Most Reasonably Construed as Not Conferring an Admission for Adjustment of Status Purposes

While we are satisfied that plain language answers the question of whether TPS is an admission for the purpose of section 245(a) of the Act, there is merit to also addressing the alternative argument that section 244(f)(4) is subject to more than one plausible interpretation with respect to whether it deems TPS recipients to be admitted for adjustment-of-status purposes, and therefore is ambiguous.  We acknowledge that the several federal courts that have ruled on this issue have not deferred to the agency's long-held, reasonable construction, beginning with the General Counsel's rationale issued in legacy INS memoranda.  *See, e.g., Ramirez*, 852 F.3d at 958-59 ("It bears noting, however, that even if we were to proceed to step two because the statute is unclear on the 'admitted' issue, the government has not identified any controlling agency interpretation to which we owe deference.").  To the extent there might be any lingering ambiguities with respect to section 244(f)(4), we seek to exercise our duty to resolve any "ambiguities in [the] statute" and "fill any statutory gaps in reasonable fashion."[25]  *Negusie v. Holder*, 555 U.S. at 523 (citation omitted); *see Matter of Richmond*, 26 I&N Dec. 779, 788 (BIA 2016) (clarifying statutory ambiguities "where the specific question is not answered by the plain language of the statute, either because the language is silent or is susceptible to varying interpretations").

Even assuming that the statutory text is ambiguous in this regard, we would adopt the same long-held, reasonable construction that TPS does not provide an admission for purposes of adjustment of status.  In doing so, we take into consideration the "interpretive clues" that Congress has provided.  *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 586 (2004).  We have recited at length such "interpretive clues" that support our understanding.  *See supra*, Section III.A.2.  For example, where there is any

---

[25]  A federal court's review of an agency's interpretation of a statute follows the two-step analysis described in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Hernandez v. Sessions*, 884 F.3d 107, 110 (2d Cir. 2018).  A court would first "determine whether Congress has directly spoken to the precise question at issue, and if it has, we give effect to Congress's unambiguously expressed intent." *Hernandez*, 884 F.3d at 110 (quotation marks, alterations, and citation omitted).  "If, however, the statute is ambiguous," the court would "proceed to a second step of analysis to determine whether the agency's interpretation is reasonable, and if it is, [the court] must defer to it."  *Id.* at 110 (internal quotation marks, alterations, and citation omitted).  The agency's "position prevails if it is a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best."  *Martinez Gutierrez*, 566 U.S. at 591.

lingering ambiguity in the statutes, "[l]egislative history can be a legitimate guide to a statutory purpose obscured by ambiguity[.]" *Burlington N. R.R. Co. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1984).

These clues support our interpretation of the statutory text, which is "consonant with [our] view of the purposes and policies underlying" sections 244 and 245 of the Act. *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 75 (2014) (plurality op.). Specifically, our rationale is consistent with the purpose of TPS, which is "designed to temporarily prevent removal of aliens during extraordinary and temporary conditions that prevent safe return." *De Leon Ochoa*, 622 F.3d at 354; *see also Donnee v. Holder*, 750 F.3d 951 (1st Cir. 2014) (citing with approval *Matter of Sosa-Ventura*, and concluding that TPS merely prevents the execution of a removal order). Indeed, "Congress clearly did not intend for TPS to create a permanent immigration status in the United States." *Matter of Sosa-Ventura*, 25 I&N Dec. at 39495; *see* section 244(f)(1) of the Act (providing that an alien granted TPS is not "considered to be permanently residing in the United States under color of law").

Consistent with the legislative history and purpose of TPS, Congress intended to preserve the ability of aliens who are admitted in a valid status, who are unable to timely depart owing to circumstances in their home countries, and who are granted TPS, to maintain lawful status and, perhaps later, to adjust their status to lawful permanent resident. *See* Section 244(a)(5) of the Act ("The granting of [TPS] shall not be considered to be inconsistent with the granting of nonimmigrant status under this chapter."); section 245(c)(2) of the Act (generally precluding aliens who have failed to continuously maintain lawful status from adjusting their status). Congress noticeably did not extend that benefit to individuals who entered the United States unlawfully as it has in other provisions of the immigration laws. *See, e.g.,* sections 209(b), 240A(b) of the Act.

Accordingly, even if the statute is ambiguous, the most reasonable reading of section 244(f)(4) of the Act is that it does not render a beneficiary "inspected and admitted or paroled" for purposes of adjusting to permanent resident status. *Cf., e.g.*, *Matter of C-T-L-*, 25 I&N Dec. 341, 348 (BIA 2010) ("[E]ven if we were unable to discern a clear congressional intent . . . , we would reach the same result. Our [interpretation] represents at a minimum a 'reasonable choice within a gap left open by Congress.' Thus, assuming that the statutory language gap makes the statute ambiguous, we would adopt this approach as a matter within our adjudicative authority and administrative judgment." (quoting *Chevron, U.S.A., Inc., v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984))). This reading harmonizes section 244(f)(4) of the Act with the overall statutory scheme, including section 101(a)(13)(A) of the Act (defining admission).

## IV. CONCLUSION

Based on the plain language of the statute, we conclude that section 244(f)(4) of the Act does not confer a broad remedy for prior immigration violations. Even if we were to conclude that the statute is ambiguous, we must favor an interpretation that reads section 244(f)(4) of the Act in harmony with section 245 of the Act and the purpose and legislative history of the TPS provisions. Upon consideration of the plain language, its construction, its operation in the larger statutory scheme, its legislative history, and its application by the agency charged with its administration since its inception, we would follow USCIS's and the former INS's long-standing interpretation. Accordingly, under either a plan language or ambiguity analysis, the end result is the same—TPS is not an admission for purposes of section 245(a) of the Act.

Because we disagree with the Sixth and Ninth Circuit's holdings that section 244(f)(4) supplies the requisite inspection and admission or parole for purposes of section 245(a)'s threshold requirements for adjustment of status applications, we will follow those decisions only in those respective jurisdictions. *See generally Matter of Castillo-Angulo*, 27 I&N Dec. 194 (BIA 2018) (following contrary decisions of the U.S. Courts of Appeals for the Fifth and Ninth Circuits in their jurisdictions alone with respect to their interpretation of certain statutory language). However, on the question of whether a grant of TPS cures the bar at section 245(c)(2) of the Act for failure to continuously maintain lawful status since entry, both the Ninth and Sixth Circuits' statements were dicta only, as that bar did not apply to the individuals before them. Accordingly, DHS will apply the contrary holding in this decision on this issue universally. *See* 8 C.F.R. § 103.3(c).

The Applicant has not been inspected and admitted or paroled into the United States, as required by section 245(a) of the Act, and is accordingly ineligible for adjustment of status. And he further is barred from adjustment by section 245(c)(2) of the Act because he has not continuously maintained a lawful immigration status since his unlawful entry. We affirm the Director's decision denying his application under section 245 of the Act.

**ORDER:** The adjustment application is denied.