**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESUS RAMIREZ; BARBARA LOPEZ,
*Plaintiffs-Appellees*,

v.

MICAH BROWN, Acting Field Office
Director, USCIS Seattle Field Office;
LORI SCIALABBA, Acting Director,
USCIS; JOHN F. KELLY, DHS
Secretary; JEFFERSON B. SESSIONS
III, Attorney General, United States
Attorney General,
*Defendants-Appellants.*

No. 14-35633

D.C. No.
2:13-cv-01236-
TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted December 6, 2016
Seattle, Washington

Filed March 31, 2017

Before: M. Margaret McKeown, Richard C. Tallman,
and Morgan Christen, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Immigration

The panel affirmed the district court's summary judgment in favor of Jesus Ramirez in his action challenging the United States Citizenship and Immigration Service's decision finding him ineligible to adjust to lawful permanent resident status on the ground that because he entered the United States without inspection he was not "inspected and admitted or paroled" as required by 8 U.S.C. § 1255(a).

The panel held that under the Temporary Protected Status statute, 8 U.S.C. § 1254a(f)(4), a TPS recipient is deemed to be in lawful status and thereby has satisfied the requirements to become a nonimmigrant, including inspection and admission, for the purposes of adjustment of status. The panel held that as a TPS beneficiary, Ramirez was therefore eligible to obtain lawful permanent residence.

### COUNSEL

Ashley Young Martin (argued), Trial Attorney; Jeffrey S. Robins, Assistant Director; William C. Peachey, Director; Benjamin C. Mizer, Acting Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Christopher Strawn (argued) and Matthew Adams, Northwest Immigration Rights Project, Seattle, Washington, for Plaintiffs-Appellees.

## OPINION

McKEOWN, Circuit Judge:

This appeal presents a question of statutory interpretation about the interplay between two subsections of the immigration code—one involving designation of Temporary Protected Status ("TPS") and the other involving adjustment of status. The Attorney General may grant TPS to an alien who cannot safely return home to a war-torn or disaster-ridden country. During the pendency of the TPS designation, the U.S. government may not send the alien back to the unsafe country.

Jesus Ramirez, who came to the United States from El Salvador in 1999, was granted TPS in 2001 and has remained in that status to the present day. In 2012, he married Barbara Lopez, a U.S. citizen, and the couple sought lawful permanent resident status for Ramirez. Although they were unsuccessful before U.S. Citizenship and Immigration Services ("USCIS"), they prevailed in a lawsuit filed in district court.

The parties dispute whether being a TPS designee provides a pathway for Ramirez to obtain lawful permanent resident status under the adjustment statute. We hold that it does: under 8 U.S.C. § 1254a(f)(4), an alien afforded TPS is deemed to be in lawful status as a nonimmigrant—and has thereby satisfied the requirements for becoming a nonimmigrant, including inspection and admission—for purposes of adjustment of status under § 1255.

## Background

### I.   Statutory Regime

Two statutory provisions are at the heart of this appeal. The first relates to TPS, a status that the Attorney General may grant to aliens that prevents their removal from the United States while dangerous conditions persist in their home country. *See* 8 U.S.C. § 1254a(a)(1)(A), (b)(1). The second provision governs an alien's ability to adjust to lawful permanent resident status. *See id.* § 1255(a). We offer a general description of the mechanics of the TPS statute and then address where the rubber meets the road in this appeal—the intersection of the TPS and adjustment statutes.

TPS first requires a designation. When the Attorney General determines that a foreign state (or any part of a foreign state) faces an ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions that prevent aliens from returning safely, the Attorney General may designate that state (or part of the state) for TPS and grant TPS to an alien who is a national of that state. *Id.* § 1254a(a)(1)(A), (b)(1). The Attorney General sets the initial duration of the designation, which may be extended following periodic review. *See id.* § 1254a(b)(2)–(3). An alien desiring TPS requests such status by submitting an application—including detailed information about identity, residence, and admissibility—to USCIS, which considers the application. *See* 8 C.F.R. §§ 244.2, 244.7, 244.10(b). To maintain TPS, aliens must periodically re-register. *See* 8 U.S.C. § 1254a(c)(3)(C); 8 C.F.R. § 244.17(a).

An alien granted TPS receives two primary benefits during the period in which TPS is in effect: he is not subject

to removal and he is authorized to work in the United States (and supplied with the relevant accompanying documentation). 8 U.S.C. § 1254a(a)(1)–(2). The grant of TPS has other consequences. For example, the TPS beneficiary is not "considered to be permanently residing in the United States under color of law" and "may be deemed ineligible for public assistance by a State . . . or any political subdivision thereof which furnishes such assistance." *Id.* § 1254a(f)(1)–(2). If the beneficiary wishes to travel abroad, he must seek and obtain the prior consent of the Attorney General. *Id.* § 1254a(f)(3). The consequence pertinent to this appeal is that "for purposes of adjustment of status under section 1255 of this title and change of status under section 1258 of this title, *the alien shall be considered as being in, and maintaining, lawful status as a nonimmigrant*." *Id.* § 1254a(f)(4) (emphasis added).

The interpretive challenge is figuring out the extent to which the just-quoted language affects a TPS beneficiary's ability to adjust to lawful permanent resident status. Section 1255(a)—the first subsection of the adjustment statute— permits the Attorney General to adjust "[t]he status of an alien who was inspected and admitted or paroled into the United States." *Id.* § 1255(a). In addition, some aliens are statutorily ineligible to adjust their status. Section 1255(c) lists multiple categories of aliens to whom "subsection (a) shall not be applicable." *Id.* § 1255(c). One such bar under § 1255(c)(2) applies to an alien, other than an immediate relative or special immigrant defined under the statute, "who is in unlawful immigration status on the date of filing the application for adjustment of status or who has failed . . . to maintain continuously a lawful status since entry into the United States." *Id.* § 1255(c)(2). Reading the TPS and adjustment statutes together, the question we confront is whether the grant of TPS allows an alien not only to avoid

the bar under § 1255(c)(2) but also to meet the "inspected and admitted or paroled" requirement in § 1255(a). We conclude that it does and affirm the district court.

## II. Factual and Procedural History

The parties agree on the essential background facts. Ramirez is a native and citizen of El Salvador who entered the United States on May 30, 1999, without being inspected and admitted or paroled by an immigration officer. In 2001, the Attorney General designated El Salvador under the TPS program after the country suffered a series of earthquakes. *See* Designation of El Salvador Under Temporary Protected Status Program, 66 Fed. Reg. 14,214-01 (Mar. 9, 2001). With his home country designated, Ramirez applied for and received TPS. Since then, the Attorney General has continually redesignated El Salvador, *see* Extension of the Designation of El Salvador for Temporary Protected Status, 81 Fed. Reg. 44,645-03 (July 8, 2016), and Ramirez has kept his TPS registration up to date.

On July 21, 2012, Ramirez married Barbara Lopez, a U.S. citizen. She filed a Form I-130 "Petition for Alien Resident" on behalf of Ramirez, and Ramirez filed a Form I-485 application to adjust his status to that of a lawful permanent resident. USCIS approved Lopez's petition on April 16, 2013.

However, eight days later, on April 24, 2013, USCIS denied Ramirez's separate application. The agency explained that Ramirez was "ineligible as a matter of law to adjust status in the United States" because he had not shown that he was inspected and admitted or paroled at the time of his May 1999 entry into the United States nor that he was exempt from that requirement. Although USCIS recognized that, by virtue of the grant of TPS, Ramirez is "considered

as if [he] was in a lawful non-immigrant status," it concluded that that treatment does not override the adjustment statute's general requirement to be inspected and admitted or paroled.

Ramirez and Lopez then filed suit in the Western District of Washington, bringing an action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The district court determined that USCIS's interpretation is incorrect as a matter of law because the TPS statute clearly provides that recipients count as being "inspected and admitted" for purposes of adjusting their status.

The court also noted that, though it need not defer to the agency's interpretation where the statute unambiguously answers the question at issue, the agency's non-precedential decisions do not deserve deference because they reach the wrong conclusion and do not thoroughly examine the question at issue. Finally, the court closed with the policy consideration that Ramirez has established a life in the United States and should not have to leave the country to seek admission. For these reasons, the district court ruled that Ramirez is entitled to summary judgment because he meets the requirements of § 1255(a) to adjust his status. We review this judgment de novo, *Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 578 (9th Cir. 2016), through the lens of the APA's "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, 5 U.S.C. § 706(2)(A).

## Analysis

Ramirez desires to adjust his status to that of a lawful permanent resident, a process governed by 8 U.S.C. § 1255. All parties agree that Ramirez must comply with the requirements of the first subsection, which provides that

> [t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

*Id.* § 1255(a).  Ramirez easily satisfies subsections (a)(1) and (a)(3) because he made an application for adjustment of status and an immigrant visa is immediately available through his American citizen wife.  The prefatory language and subsection (a)(2) remain.

The prefatory language asks whether Ramirez "was inspected and admitted or paroled into the United States," but for our case the question can be slightly narrowed from there.  No party contends that Ramirez was "paroled into the United States."  The government also downplays or fails to make separate arguments about inspection, and Ramirez soundly argues that he has been "inspected" because TPS applicants undergo a rigorous inspection process by an immigration officer.  Therefore, the action in this appeal centers on whether Ramirez has been "admitted" as that term is used in § 1255(a).  Although the government separately contends that Ramirez flunks subsection (a)(2) because his May 1999 illegal entry renders him inadmissible, *see id.* § 1182(a)(6)(A)(i), the question whether Ramirez is

"admissible" is bound up with whether the grant of TPS to Ramirez means that he has been "admitted."

This takes us to the TPS statute. The operative provision, § 1254a(f)(4), states that TPS recipients "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" for purposes of adjustment of status. Under the familiar two-step framework for evaluating an agency's statutory interpretation, we first consider whether the statute is unambiguous. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

Employing the traditional canons of statutory construction at step one, we conclude that § 1254a(f)(4) unambiguously treats aliens with TPS as being "admitted" for purposes of adjusting status. Because the statutory language is clear, that ends the inquiry: the agency has no interpretive role to play but must instead follow the congressional mandate. *Chevron*, 467 U.S. at 842–43 & n.9; *see I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987).

It bears noting, however, that even if we were to proceed to step two because the statute is unclear on the "admitted" issue, the government has not identified any controlling agency interpretation to which we owe deference. *See Chevron*, 467 U.S. at 843–44. The cited published decisions do not address the statutory interpretation question at issue here. *See In re Alyazji*, 25 I. & N. Dec. 397 (B.I.A. 2011); *In re Sosa Ventura*, 25 I. & N. Dec. 391 (B.I.A. 2010). The remaining decisions—variously issued by the Immigration and Naturalization Service General Counsel, Board of Immigration Appeals ("BIA"), and USCIS—are non-precedential, *see* 8 C.F.R. § 1003.1(d)(1), (g), so the deference owed depends on their persuasive value, *see Garcia v. Holder*, 659 F.3d 1261, 1266–67 (9th Cir. 2011). While the decisions stretch back to 1991, that consistency is

strongly outweighed by a pervasive lack of thorough and valid reasoning, as the decisions often state a conclusory answer without taking into account the various statutory and other considerations at play. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Because the agency's interpretation does not warrant deference, we must decide the proper construction based on the text, structure, and purpose of the relevant provisions.

## I.   The Plain Statutory Language

The language of the TPS statute itself strongly points to the conclusion that Ramirez qualifies as "admitted" for adjusting his status. *See POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2236 (2014) (noting the primacy of the text in statutory interpretation). In particular, § 1254a(f)(4) broadly states that "[d]uring a period in which an alien is granted temporary protected status under this section[,] for purposes of adjustment of status under section 1255 of this title . . . , the alien shall be considered as being in, and maintaining, *lawful status as a nonimmigrant*." (Emphasis added.) The language explicitly refers to the adjustment statute, § 1255, and confers the status of lawful nonimmigrant on TPS recipients when looking at adjusting their status.

The Sixth Circuit, squarely addressing the same interpretive issue, concluded that that text is clear. *Flores v. U.S. Citizenship & Immigration Servs.*, 718 F.3d 548, 551–53 (6th Cir. 2013). The court explained that "exactly what § 1254a(f)(4) provides [is that a TPS recipient] is considered [as] being in lawful nonimmigrant status and thus meets the ['admitted'] requirement[] in § 1255." *Id.* at 554. Like the Sixth Circuit, "[w]e interpret the statute exactly as written— as allowing [a TPS recipient] to be considered as being in

lawful status as a nonimmigrant for purposes of adjustment of status under § 1255." *Id.* at 553.

The Eleventh Circuit has taken a contrary position, holding that the statutes unambiguously point the other way: "[t]he plain language of § 1255(a) limits eligibility for status adjustment to an alien who has been inspected and admitted or paroled" and "[t]hat an alien with Temporary Protected Status has 'lawful status as a nonimmigrant' for purposes of adjusting his status does not change § 1255(a)'s threshold [eligibility] requirement." *Serrano v. U.S. Attorney Gen.*, 655 F.3d 1260, 1265 (11th Cir. 2011) (per curiam). While the Sixth Circuit in *Flores* and the district court here attempt to distinguish *Serrano* on the ground that the petitioner there did not disclose his illegal entry into the country in his TPS application, *see Serrano*, 655 F.3d at 1265 n.4, that factual difference has no bearing on the Eleventh Circuit's conclusion that § 1254a(f)(4) does not override § 1255(a)'s threshold "inspected and admitted" requirement. Nevertheless, for the reasons discussed below, we disagree with the Eleventh Circuit and decline to follow *Serrano*.[1]

Under the immigration laws, an alien who has obtained lawful status as a nonimmigrant has necessarily been

---

[1] Significantly, the division in opinion between the Sixth and Eleventh Circuits on the plain meaning of the statutes does not establish ambiguity. On multiple occasions, the Supreme Court has held that a provision is unambiguous even when the circuits are split on the interpretive issue. *See, e.g.*, *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1706 & n.2, 1709–11 (2012) (holding that the term "individual" as used in the Torture Victim Protection Act unambiguously encompasses only natural persons notwithstanding disagreement among several circuits); *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 99 & n.4, 113 & n.12 (2012) (holding that § 906(c) of the Longshore and Harbor Workers' Compensation Act is unambiguous despite disagreement between the Fifth, Ninth, and Eleventh Circuits about its meaning).

"admitted."    The statutory provisions refer to "[t]he *admission* to the United States of any alien as a *nonimmigrant*," though the duration and purpose of the alien's stay may be tightly circumscribed.    8 U.S.C. § 1184(a)(1) (emphases added); *see id.* §§ 1182(d)(1) ("alien's admission as a nonimmigrant"), 1184(g)(4) ("the period of authorized admission as such a nonimmigrant"), 1187(a)(7) ("the conditions of any previous admission as such a nonimmigrant").    Indeed, every alien "shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status." *Id.* § 1184(b).  In other words, by the very nature of obtaining lawful nonimmigrant status, the alien goes through inspection and is deemed "admitted." *See also id.* § 1184(k)(3) ("the admission, and continued stay in lawful status, of such a nonimmigrant").

As the governing statutes and implementing regulations demonstrate, in practice, too, the application and approval process for securing TPS shares many of the main attributes of the usual "admission" process for nonimmigrants.  Like an alien seeking nonimmigrant status, *see id.* § 1184(b); 8 C.F.R. §§ 212.1, 235.1(f)(1), an alien seeking TPS must establish that he meets the identity and citizenship requirements for that status, usually by submitting supporting documentation like a passport, *see* 8 U.S.C. § 1254a(a)(1), (c)(1)(A); 8 C.F.R. § 244.9(a).  Similarly, an alien on either track must adequately demonstrate that he is eligible to be admitted to the United States, with the possibility that some grounds of inadmissibility may be waived in individual cases at the Attorney General's discretion. *Compare* 8 U.S.C. § 1182(a), (d)(11)–(12), (g)–(i); 8 C.F.R. §§ 212.7, 214.1(a)(3)(i), *with* 8 U.S.C.

§ 1254a(c)(1)(A)(iii), (c)(2)(A); 8 C.F.R. §§ 244.2(d), 244.3.

Once the request for nonimmigrant status or TPS has been submitted, the application is scrutinized for compliance—sometimes supplemented with an interview of the applicant—then approved or denied by USCIS. *Compare* 8 U.S.C. § 1184(a)(1), (b); 8 C.F.R. § 214.11(d)(6), *with* 8 U.S.C. § 1254a(a)(3)(A); 8 C.F.R. §§ 244.8, 244.10(b). That the TPS application is subject to a rigorous process comparable to any other admission process further confirms that an alien approved for TPS has been "admitted."[2]

The government pushes back, urging that the statutory definition of "admitted" at 8 U.S.C. § 1101(a)(13)(A)— which requires something akin to passage into the United States at a designated port of entry—controls, but the awkwardness of the fit is telling and makes that definition inapplicable. The government itself concedes that the port-of-entry definition is not always appropriate by acknowledging and accepting the BIA's decisions which hold that aliens can be "admitted" even if they do not meet the definition in § 1101(a)(13)(A). *See, e.g.*, *In re Alyazji*, 25 I. & N. Dec. at 399 (holding that aliens who entered the United States without permission but who later adjusted to lawful permanent residents qualify as "admitted"). Although we have said that § 1101(a)(13)(A) provides the "primary, controlling definition" of "admitted," we similarly have "embrace[d] an alternative construction of the term"

---

[2] Even USCIS referred to Ramirez as being "admitted." Ironically, in its letter denying Ramirez's application to adjust his status, the agency remarked that Ramirez must keep his TPS current by "comply[ing] with all the conditions that apply to [his] nonimmigrant *admission*."

when the statutory context so dictates. *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1052 (9th Cir. 2014) (citation omitted) (surveying situations where our court has held that the definition of "admitted" in § 1101(a)(13)(A) is inapplicable); *see also Roberts v. Holder*, 745 F.3d 928, 932 (8th Cir. 2014) (per curiam) ("The immigration statutes use the words 'admitted' and 'admission' inconsistently.").

Turning again to the plain language, the adjustment statute uses "admission" in a way that is inconsistent with the port-of-entry definition when it states that "the Attorney General shall record the alien's lawful admission for permanent residence" on the date the adjustment application is approved. *See* 8 U.S.C. § 1255(b). In the current context, the port-of-entry definition yields, and an alien granted TPS is considered "admitted."

## II. Structure of the Statutory Regime

Other familiar interpretive guides reinforce the plain meaning understanding that TPS recipients are considered "admitted" under § 1255. Section 1255 is titled "Adjustment of status of nonimmigrant to that of person admitted for permanent residence." The heading is not without significance, as it uses language that directly links the adjustment statute to the TPS statute and § 1254a(f)(4)'s phrasing of "lawful status as a nonimmigrant." This language and structure signal that Congress contemplated that TPS recipients, via their treatment as lawful nonimmigrants, would be able to make use of § 1255. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute" (internal quotation marks and citation omitted)).

A related provision also links § 1254a(f)(4)'s use of "lawful status as a nonimmigrant" to the concept of being "admitted." Section 1254a(f)(4)'s mandate that TPS recipients "shall be considered as being in, and maintaining, lawful status as a nonimmigrant" expressly applies "for purposes of . . . change of status under section 1258 of this title." Section 1258(a) in turn provides that, subject to a number of exceptions, "[t]he Secretary of Homeland Security may . . . authorize a change from any nonimmigrant classification to any other nonimmigrant classification in the case of any alien lawfully admitted to the United States as a nonimmigrant who is continuing to maintain that status" and is not inadmissible. Tracking the language in the two provisions, § 1254a(f)(4) equates "being in . . . lawful status as a nonimmigrant" with § 1258(a)'s "lawfully admitted . . . as a nonimmigrant." This statutory mirroring is significant because § 1258 uses the word "admitted," thus supporting the interpretation that "being in . . . lawful status as a nonimmigrant" qualifies Ramirez as being "admitted" for purposes of both statutory provisions—§§ 1255 and 1258— cited in § 1254a(f)(4).

The government would limit § 1254a(f)(4)'s effect to one subsection in § 1255—specifically, § 1255(c)(2)— because those two provisions both refer to being in "lawful status" rather than being "admitted." But we see multiple problems with the government's interpretation. For one, § 1254a(f)(4) does not point to one particular subsection of § 1255 but instead says that it applies "for purposes of adjustment of status under section 1255." We acknowledge that this statement of broad application does not answer all questions: it does not tell us which subsections § 1254a(f)(4) applies to, and § 1254a(f)(4)'s language clearly has no effect in some of § 1255's subsections. But the general reference to § 1255 cuts against the government's effort to confine the

effect of § 1254a(f)(4) to one specific subsection in § 1255. Such an interpretation appears particularly crabbed when Congress easily could have written the statute to refer solely to subsection (c)(2) but chose not to do so.

The government's interpretation would also yield an anomalous result because § 1254a(f)(4) would not benefit immediate relatives of U.S. citizens seeking adjustment—like Ramirez—for no discernible reason. By its terms, § 1255(c)(2) does not apply to a U.S. citizen's immediate relatives—*i.e.*, children, spouses, and parents, 8 U.S.C. § 1151(b)(2)(A)(i).[3] Thus, if § 1254a(f)(4) were interpreted to apply only to § 1255(c)(2), as the government says, § 1254a(f)(4) would be meaningless for adjustment seekers who are immediate relatives of U.S. citizens. Such an interpretation would rob the statute of much force: in the government's brief, the only groups that it pinpoints that would benefit from § 1254a(f)(4)'s elimination of the (c)(2) bar are applicants seeking adjustment based on employment-based visas and applicants seeking adjustment based on relatives other than spouses, children, and parents.[4]

---

[3] Not only does § 1255(c)(2) exclude immediate relatives from its coverage, but it also does not apply to certain special immigrants defined in § 1101(a)(27)(H), (I), (J), (K), or to various aliens classified as priority workers, advanced-degree professionals, or skilled workers under § 1151(b) if they meet the conditions specified in § 1255(k)(1)–(2). While we think the exclusion of immediate relatives is most striking, the fact that other large swaths of potential beneficiaries already fall outside the (c)(2) bar further bolsters our conclusion that the government does not leave § 1254a(f)(4) to do much work.

[4] At oral argument, the parties also acknowledged that aliens present on a tourist or student visa could qualify. *See* Oral Argument at 33:30–34:20, *Ramirez v. Dougherty*, No. 14-35633 (9th Cir. Dec. 6, 2016), http://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000010663.

Restricting § 1254a(f)(4) in this way seems especially peculiar in the face of § 1254a(f)(4)'s indication that it benefits all TPS grantees and the government's failure to offer any explanation or clear language indicating that Congress meant for such a limited operation. These textual and practical incongruities suffice to reject the government's construction, particularly because the language in §§ 1254a(f)(4) and 1255(c)(2) does not line up exactly.

Nor are we persuaded by the government's identification of other provisions that it says provide more precise exceptions for particular groups of aliens to § 1255(a)'s "admitted" requirement. For example, § 1255(a) itself removes the "inspected and admitted or paroled" requirement for applicants covered by the Violence Against Women Act ("VAWA"), stating that "the status of any other alien having an approved petition for classification as a VAWA self-petitioner may be adjusted by the Attorney General." Similarly, § 1255(g) explains that "[i]n applying this section to a special immigrant described in section 1101(a)(27)(K) of this title, such an immigrant shall be deemed, for purposes of subsection (a), to have been paroled into the United States." But these exceptions do not bear on the remaining language in § 1255 or the TPS statute, and, regardless, they were added to the code after the enactment of § 1255(a)'s "admitted" requirement and the TPS statute. *See* Violence Against Women and Department of Justice Reauthorization Act—Technical Corrections, Pub. L. No. 109-271, 120 Stat. 750 (2006) (adding VAWA exception language); Armed Forces Immigration Adjustment Act of 1991, Pub. L. No. 102-110, 105 Stat. 555 (adding § 1255(g)); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (enacting TPS statute). Even if those exceptions are formulated more precisely, there is no requirement that Congress draft an elegant statute. We can

certainly identify good reasons why Congress may have written the statute the way it did; in addition to pure administrative ease, Congress may have wanted to vary the scope of the exceptions for different groups.

In general, the TPS statute places great—though not unfettered—discretion into the hands of the Attorney General to make specific determinations about an individual alien's fitness to enter the country.  Indeed, while the requirements related to certain criminals and former Nazis may not be waived, *see* 8 U.S.C. § 1254a(c)(2)(A)(iii), the Attorney General may waive other grounds of inadmissibility "in the case of individual aliens for humanitarian purposes, to assure family unity, or when it is otherwise in the public interest," *id.* § 1254a(c)(2)(A)(ii). The statute thus contemplates and confers the power to vet each applicant thoroughly and make delicate judgments on a particularized basis about whether the alien should be "admitted" into the United States.

### III.    Allowing Adjustment of Status Is Consistent with the Purpose of the TPS Statute

Finally, we note that interpreting § 1254a(f)(4) to confer a limited "admission" on TPS recipients is consistent with the purpose of TPS.  *See Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (stating that statutory interpretation involves looking at a provision in the context of the entire scheme, including the "objects and policy of the law").  The TPS regime provides a limited, temporary form of relief for the period that conditions render an alien's return unsafe by creating a safe harbor and authorizing recipients to work in the United States to support themselves for the duration of their stay.  *See, e.g.*, 8 U.S.C. § 1254a(b), (e), (f)(1), (h)(1). Allowing TPS recipients to adjust their status comfortably fits within that purpose.

Because TPS confers an actual status on and provides a slew of benefits to an alien who satisfies rigorous eligibility requirements, it is different than other forms of temporary reprieve we ordinarily would not consider sufficient for "admission." This designation puts an alien granted TPS in a different position than an alien granted employment authorization or approval of a visa petition, forms of relief that our court has ruled do not, by themselves, constitute an "admission." *See Guevara v. Holder*, 649 F.3d 1086, 1093–94 (9th Cir. 2011); *Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1105–06 (9th Cir. 2011).

And the government's interpretation is inconsistent with the TPS statute's purpose because its interpretation completely ignores that TPS recipients are allowed to stay in the United States pursuant to that status and instead subjects them to a Rube Goldberg-like procedure under a different statute in order to become "admitted." According to the government, an alien in Ramirez's position who wishes to adjust his status would first need to apply for and obtain a waiver of his unlawful presence, which he could pursue from within the United States. *See* Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives, 78 Fed. Reg. 536-01, 536 (Jan. 3, 2013). Assuming that Ramirez demonstrates "extreme hardship" to his U.S. citizen wife and the waiver is granted, *see* 8 U.S.C. § 1182(a)(9)(B)(v), he would then need to exit the United States to seek an immigrant visa through processing at a U.S. embassy or consulate in another country. Such processing usually takes place in the alien's home country—in this case, the country that the Attorney General has deemed unsafe—though it can occur in another country with approval from the Department of State and the third country. *See* 22 C.F.R. § 42.61(a). If he obtains the visa, Ramirez could then return to the United States to request admission as a lawful

permanent resident. To be sure, other nonimmigrants must leave the country to adjust their status, *see* 8 U.S.C. § 1255(i), but the invocation of these procedures in other circumstances does not undercut the clear language of the TPS statute on the "admitted" issue, and the convoluted nature of the government's proposal underscores its unnatural fit with the overall statutory structure.

In short, § 1254a(f)(4) provides that a TPS recipient is considered "inspected and admitted" under § 1255(a). Accordingly, under §§ 1254a(f)(4) and 1255, Ramirez, who has been granted TPS, is eligible for adjustment of status because he also meets the other requirements set forth in § 1255(a). USCIS's decision to deny Ramirez's application on the ground that he was not "admitted" was legally flawed, and the district court properly granted summary judgment to Ramirez and remanded the case to USCIS for further proceedings.

**AFFIRMED.**