**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EDUARDO J. ENRIQUEZ, AKA
Eduardo Jobanny Enriquez,
                    *Petitioner*,

v.

WILLIAM P. BARR, Attorney General,
                    *Respondent.*

No. 13-72934

Agency No.
A095-465-235

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submission Deferred April 3, 2020
Submitted August 6, 2020*
Pasadena, California

Filed August 13, 2020

Before:  Kim McLane Wardlaw, Mary H. Murguia,
and Eric D. Miller, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge Murguia

---

*The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

# SUMMARY[**]

### Immigration

Denying Eduardo Enriquez's petition for review of a decision of the Board of Immigration Appeals, the panel held that Enriquez was not "admitted" within the meaning of the cancellation of removal statute, 8 U.S.C. § 1229b(a)(2), when he was approved as a derivative beneficiary of his mother's self-petition under the Violence Against Women Act (VAWA).

In 2000, Enriquez's mother self-petitioned under VAWA, filing a Form I-360 Petition for Special Immigrant and listing Enriquez as her dependent child. The petition was approved the same year, and Enriquez was granted deferred action and later received work authorization. In 2008, Enriquez adjusted to lawful permanent resident (LPR) status.

After a conviction in 2012, Enriquez was charged as removable for having committed a crime involving moral turpitude within five years of admission. He conceded removability, an immigration judge denied his application for cancellation of removal, and the BIA affirmed.

For cancellation of removal, as relevant here, a lawful permanent resident must have "resided in the United States continuously for 7 years after having been admitted in any status." 8 U.S.C. § 1229b(a)(2). The panel explained that Enriquez's period of continuous residence stopped accruing

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

when he committed a crime of moral turpitude in 2012, and therefore, to meet the seven-year residence requirement, he had to show he was "admitted in any status" in 2005 or earlier.

The panel explained that the court generally defines "admitted" by reference to the Immigration and Nationality Act (INA)'s statutory definition, 8 U.S.C. § 1101(a)(13)(A), which requires "lawful entry . . . after inspection and authorization by an immigration officer." However, the panel noted that the court has embraced an alternative construction of the term when the statutory context dictates, and that the BIA has recognized that "compelling reasons" may justify a deviation from the statutory definition.

The panel further explained that, in *Medina-Nunez v. Lynch*, 788 F.3d 1103 (9th Cir. 2015) (per curiam), the court deferred to a BIA decision concluding that participation in the Family Unity Program does not constitute an admission for purposes of cancellation of removal. In *Medina-Nunez*, as the panel observed, the court also narrowed the definition of "admitted" under § 1229b(a)(2), absent "compelling reasons," to the INA's statutory definition. Moreover, the panel explained that the court has since extended the reach of *Medina-Nunez* to hold that petitioners who received comparable discretionary benefits are not "admitted" for purposes of cancellation of removal.

The panel concluded that neither the approval of the Form I-360 in 2000, nor Enriquez's subsequent receipt of deferred action and work authorization, satisfies the statutory definition of "admission." The panel explained that the court has previously held that the approval of a comparable Form I-130 petition does not constitute an admission. Further, the panel concluded that the grant of

deferred action and work authorization are benefits similar to, or less substantial than, the benefits contemplated by the Family Unity Program in *Medina-Nunez*.

Therefore, the panel concluded that Enriquez was not "admitted in any status" until 2008, when he became an LPR, and therefore, he was unable to satisfy the requirement of seven years of continuous residence after admission.

Concurring, Judge Murguia agreed that, under the court's precedent, Enriquez could not be deemed "admitted in any status," but wrote separately to underscore that the case law is inconsistent with the statutory context and undermines VAWA's purpose of expanding immigration relief to undocumented immigrants who experience domestic abuse.

## COUNSEL

Gabriella Navarro-Busch, Ventura, California, for Petitioner.

Terri J. Scadron, Assistant Director; Corey L. Farrell, Attorney; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PER CURIAM:

Eduardo Enriquez petitions for review of the Board of Immigration Appeals' (BIA) decision dismissing his appeal and affirming the Immigration Judge's (IJ) denial of his application for cancellation of removal. Because we are bound by our decision in *Medina-Nunez v. Lynch*, 788 F.3d 1103 (9th Cir. 2015) (per curiam), we hold that Enriquez was not "admitted" under 8 U.S.C. § 1229b(a)(2) when he was approved as a derivative beneficiary of his mother's self-petition under the Violence Against Women Act (VAWA). We therefore deny his petition for review.

**I.**

Enriquez is a native and citizen of Mexico who entered the United States without inspection in 1997 at the age of four. In 2000, Enriquez's mother self-petitioned under VAWA, filing a Form I-360 Petition for Special Immigrant and listing Enriquez as her dependent child. The Immigration and Naturalization Service (INS) approved the petition and granted Enriquez deferred action as a derivative beneficiary of his mother's self-petition. Enriquez received work authorization in 2003, and adjusted to lawful permanent resident (LPR) status in 2008. Four years later, in 2012, Enriquez was convicted of attempting to dissuade a witness in violation of California Penal Code section 136.1(a)(2). The Department of Homeland Security (DHS) issued him a Notice to Appear, charging him with removability for committing a crime of moral turpitude within five years of admission under 8 U.S.C. § 1227(a)(2)(A)(i).

Enriquez conceded the allegations against him but applied for cancellation of removal under 8 U.S.C. § 1229b(a). In a single-member, unpublished decision, the BIA affirmed the IJ's conclusion that Enriquez was not eligible for cancellation of removal. The BIA explained that Enriquez had not "resided in the United States continuously for 7 years after having been admitted in any status," as required by 8 U.S.C. § 1229b(a)(2). It reasoned that the 2000 approval of Enriquez's derivative VAWA petition was not an "admission" and therefore Enriquez was not "admitted" until 2008 when he adjusted to LPR status. The BIA acknowledged that our decision in *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1009 (9th Cir. 2006), had previously concluded that participation in the Family Unity Program (FUP)—a program "designed to help families stay together while the beneficiaries adjust to LPR status," *id.*—constituted an admission. But the BIA declined to extend that reasoning to VAWA, reasoning that *Garcia-Quintero* conflicted with the BIA's subsequent decision *In re Reza-Murillo*, 25 I. & N. Dec. 296, 297–99 (BIA 2010), which held that participation in the Family Unity Program was not an "admission" for purposes of cancellation of removal because the grant of FUP benefits did not involve "'entry . . . after inspection and authorization by an immigration officer' under Section 101(a)(13)(A) of the Act." *Id.* The BIA dismissed Enriquez's appeal, and he timely petitioned for our review.

## II.

### A.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). "We review the BIA's determination of questions of law de novo, subject to established principles of deference." *Alanniz v. Barr*, 924 F.3d 1061, 1065 (9th Cir. 2019).

For cancellation of removal, a petitioner must have: (1) been "lawfully admitted for permanent residence for not less than 5 years;" (2) "resided in the United States continuously for 7 years after having been admitted in any status;" and (3) "not been convicted of any aggravated felony." 8 U.S.C. § 1229b(a). We must decide whether approval of the VAWA self-petition in 2000 is an "admission" within the meaning of § 1229b(a)(2).

We generally define "admitted" by reference to the Immigration and Nationality Act (INA)'s statutory definition in 8 U.S.C. § 1101(a)(13)(A), which requires "lawful entry . . . after inspection and authorization by an immigration officer." *See Medina-Nunez*, 788 F.3d at 1105. However, we "have 'embrace[d] an alternative construction of the term' when the statutory context so dictates." *Ramirez v. Brown*, 852 F.3d 954, 961 (9th Cir. 2017) (quoting *Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1052 (9th Cir. 2014)). The BIA has likewise recognized that "compelling reasons" may justify a deviation from the statutory definition. *Reza-Murillo*, 25 I. & N. Dec. at 299. For example, the BIA held in *In re Rosas-Ramirez*, 22 I. & N. Dec. 616, 623 (BIA 1999), that adjustment to LPR status constituted an "admission" even if the adjustment was preceded by an entry that was unlawful or without inspection, in part because one who has LPR status has been "lawfully admitted for permanent residence," 8 U.S.C. § 1101(a)(20). This holding avoided the "absurdity of treating aliens who entered the United States without inspection prior to being granted [LPR] status more like aliens without any valid immigration status than like permanent resident aliens who entered the United States after inspection." *Reza-Murillo*, 25 I. & N. Dec. at 298 (citing *Rosas-Ramirez*, 22 I. & N. Dec. at 621–23).

By contrast, in *Reza-Murillo* the BIA found no comparable "absurd or bizarre results" in applying the statutory definition of "admission" to participation in the Family Unity Program. *Id.* at 298–99. Participants in the Family Unity Program receive a temporary grant of voluntary departure, limited ability to travel outside of the United States, and work authorization. *Id.* at 297 n.1, 299 (citing 8 C.F.R. §§ 236.15, 236.16). However, unlike LPRs, they are not considered to have been "lawfully *admitted* for permanent residence." *Id.* at 298 (citing 8 U.S.C. § 1101(a)(20)). The BIA therefore held that the statutory definition of "admitted" controlled and that participation in the Family Unity Program is not an admission for cancellation of removal because the "grant of FUP benefits did not itself involve [the petitioner's] 'entry . . . into the United States after inspection and authorization by an immigration officer.'" *Id.* at 297 (quoting 8 U.S.C. § 1101(a)(13)(A)).

In 2015, we afforded deference under *Brand X*[1] to the BIA's decision in *Reza-Murillo*, narrowed our definition of "admitted" under § 1229b(a)(2), absent "compelling reasons," to the INA's statutory definition under Section 1101(a)(13)(A), and held that "acceptance into the Family Unity Program does not constitute an admission for purposes of § 1229b(a)(2)." *Medina-Nunez*, 788 F.3d at 1105. We have since extended the reach of *Medina-Nunez* to hold that petitioners who received comparable discretionary benefits

---

[1] In *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982 (2005), the Supreme Court held that a prior judicial construction of a statute controls despite a later agency interpretation to the contrary that is otherwise entitled to *Chevron* deference if the prior construction "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."

are not "admitted" and thus ineligible for cancellation of removal. For example, in *Fuentes v. Lynch*, 837 F.3d 966, 967–68 (9th Cir. 2016) (per curiam), we held that the petitioner—a derivative beneficiary of his mother's asylum and Nicaraguan Adjustment and Central American Relief Act (NACARA) applications who received work authorization—was not "admitted" for cancellation of removal purposes because he had not satisfied the statutory definition. We followed suit in *Alanniz v. Barr*, holding that the receipt of discretionary parole for the possibility of adjustment of status was not an admission for cancellation of removal. 924 F.3d at 1065–67. In both cases, we reasoned that because the benefits from the administrative actions at issue were less generous than the Family Unity Program, and because the statutory and regulatory language did not require our application of a definition different from the statutory definition of "admission," the receipt of those benefits was not an admission within the meaning of the cancellation of removal provision. *See id.* at 1066–67; *Fuentes*, 837 F.3d at 968.

## B.

Enriquez's period of continuous residence stopped accruing when he committed a crime of moral turpitude in 2012. *See* 8 U.S.C. 1229b(d)(1). Therefore, to meet the seven-year continuous residence requirement for cancellation of removal under § 1229b(a), Enriquez must show he was "admitted in any status" in 2005 or earlier. *Id.* § 1229b(a)(2).

Enriquez does not argue that he was admitted in 1997, when he physically entered the United States without inspection. It is also undisputed that Enriquez was admitted when he adjusted his status to LPR in 2008, but he cannot satisfy the seven-year continuous residence requirement

with this date of admission. Instead, Enriquez contends that he was "admitted" through agency approval of his mother's Form I-360 VAWA self-petition and his subsequent receipt of deferred action and work authorization in 2003. In light of our controlling precedent, we must reject this argument.

An individual may file a self-petition under VAWA if he has suffered battery or extreme cruelty at the hands of an abusive LPR spouse. *See* 8 U.S.C. § 1154(a)(1)(B)(ii)(I). The approval of a Form I-360 VAWA self-petition permits a battered spouse to apply for adjustment to LPR status, but is not itself an adjustment of status. *See* 8 U.S.C. § 1255(a). When a VAWA self-petition is approved, the self-petitioner and his dependent children included in the petition become eligible for deferred action and work authorization. 8 U.S.C. §§ 1154(a)(1)(D)(i)(IV), (a)(1)(K).

Neither the approval of the Form I-360 listing Enriquez as a derivative beneficiary, nor his subsequent receipt of deferred action and work authorization, satisfies the statutory definition of "admission" under the INA. We have previously held that the approval of a comparable Form I-130 petition, which authorizes the petitioner to apply for adjustment of status but is not itself an adjustment, does not constitute an admission satisfying the requirements for cancellation of removal. *See Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1101–02 (9th Cir. 2011). Like the approval of a Form I-130, approval of a Form I-360 Petition for Special Immigrant is not itself an adjustment of status, but is only "one step in the application for adjustment of status." *Id.* at 1103. Thus, simple approval of the petition cannot be the equivalent of inspection and authorization to enter and remain in the United States under our precedent. *Id.*

As a derivative beneficiary of his mother's VAWA self-petition, Enriquez also received deferred action and work

authorization. Both benefits are similar to, or less substantial than, the benefits contemplated by the Family Unity Program, participation in which we have previously held is not an "admission." *Medina-Nunez*, 788 F.3d at 1105. Beneficiaries of the Family Unity Program, like successful VAWA petitioners, are eligible for work authorization. 8 U.S.C. § 274a.12(a)(14). The Family Unity Program also includes an extendable two-year grant of voluntary departure and limited freedom to travel outside of the United States. 8 C.F.R. §§ 236.15(c), 236.16. By contrast, VAWA beneficiaries may be granted deferred action, which provides "no formal immigration status" and is only a temporary exercise of administrative discretion "not to pursue deportation proceedings" against someone who is "otherwise eligible for removal." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 487 (9th Cir. 2018) *vacated in part, rev'd in part,* 140 S. Ct. 1891 (2020). Because the benefits Enriquez received are similar to, or less substantial than those we have already found insufficient to constitute an "admission" for cancellation of removal, *see Medina-Nunez*, 788 F.3d at 1105, Enriquez was not "admitted" under § 1229b(a)(2) when he received deferred action and work authorization under VAWA. *See Alanniz*, 924 F.3d at 1066–67 ("Because we have held that the BIA's determination that even a specialized parole, such as acceptance into the FUP program, does not constitute an admission, Alanniz cannot prevail on his argument that his 1997 parole constitutes an admission."); *Fuentes*, 837 F.3d at 968 ("Because Fuentes enjoyed fewer benefits than FUP participants, his claim to admission is no greater than—and in fact is weaker than—persons accepted into the FUP.").

## C.

Enriquez urges us to stray from § 1101(a)(13)(A)'s definition of "admitted" as we did in *Ramirez v. Brown*, 852 F.3d 954 (9th Cir. 2017). In *Ramirez*, we held that a grant of Temporary Protected Status (TPS) was an "admission" for adjustment of status under 8 U.S.C. § 1255. *Id.* at 960–61. *Ramirez*, however, did not involve cancellation of removal but the distinct issue of the relationship between adjustment of status under § 1255 and the TPS statute under § 1254a. 852 F.3d at 958–59. We noted that the TPS statute expressly provided that, "for purposes of adjustment of status under section 1255," one who is granted TPS "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." *Id.* at 961 (quoting 8 U.S.C. § 1254a(f)(4)). This statutory language, we explained, was plainly "inconsistent" with § 1101(a)(13)(A)'s "port-of-entry definition" and justified the use of a different definition of "admitted." *Id.* at 961. But the VAWA statutes and regulations do not contain any comparable inconsistent language regarding the approval of a Form I-360 or the grant of deferred action and work authorization, and Enriquez points to none. Without that inconsistency, *Ramirez* does not support a departure from *Medina-Nunez*'s holding that § 1101(a)(13)(A) provides the governing definition of the term "admitted" for cancellation of removal. *See Medina-Nunez*, 788 F.3d at 1105.

## III.

Because Enriquez was not "admitted in any status" under our controlling precedent until 2008, and committed a crime of moral turpitude in 2012, he is unable to satisfy the requirement of seven years of continuous residence after admission for eligibility for cancellation of removal under 8 U.S.C. § 1229b(a). Therefore, the BIA properly dismissed

his appeal from the IJ's denial of that relief, and we must deny his petition for review.

**PETITION DENIED.**

---

MURGUIA, Circuit Judge, concurring:

I agree that, under our precedent, Enriquez cannot be deemed "admitted in any status" under the cancellation of removal statute, 8 U.S.C. § 1229b(a)(2), when the government approved his mother's self-petition pursuant to the Violence Against Women Act ("VAWA" or the "Act"). I write separately, however, to underscore that our case law is inconsistent with the statutory context and undermines VAWA's purpose of expanding immigration relief to undocumented immigrants who experience domestic abuse.

## I.

Enriquez, a twenty-seven-year-old native and citizen of Mexico, is a derivative beneficiary of VAWA—a landmark federal statute enacted to empower battered immigrant women and their dependent children with lawful immigration status to facilitate their escape from domestic violence. *See Hernandez v. Ashcroft*, 345 F.3d 824, 841 (9th Cir. 2003). Like many VAWA beneficiaries, Enriquez was undocumented for several years before he finally adjusted his status to legal permanent resident ("LPR"). Enriquez physically entered the United States without inspection in 1997, when he was four years old. His childhood in the United States was unfortunately disrupted by his abusive LPR stepfather, who beat Enriquez from a young age, abused Enriquez's mother, and sexually assaulted Enriquez's sister. To aid her escape from such abuse,

Enriquez's mother filed a self-petition under VAWA in 2000, listing Enriquez and his sister as derivative beneficiaries. That same year, the government approved the petition. Enriquez in turn received deferred action and work authorization, and he was authorized to apply to adjust his undocumented status to LPR. In 2008—eight years after his mother's VAWA self-petition was approved and almost twenty years after he originally entered the country— Enriquez finally became an LPR.[1]

## II.

Congress enacted VAWA "to eliminate barriers to women leaving abusive relationships." *Hernandez*, 345 F.3d at 841 (citing H.R. Rep. No. 103-395, at 25 (1994) (noting that the goal of the bill was "to combat violence and crimes against women" and "permit[] battered immigrant women to leave their batterers without fearing deportation.")). At its core, the Act sought "to eliminate immigration laws preventing battered spouses and children from leaving abusive relationships or from seeking help from law enforcement because they were afraid that they would be deported or that their abusers would withdraw sponsorship for a particular immigration benefit." *Matter of A- M-*, 25 I. & N. Dec. 66, 74 (BIA 2009) (citing H.R. Rep. No. 106-939, at 56, 111–12 (2000)).

---

[1] After his mother's VAWA self-petition was approved, Enriquez was forced to wait to adjust his status to LPR due to the limited number of green cards that Congress has allocated for family-based immigration. *See* 8 U.S.C. §§ 1153(a), 1255(a)(3). In other words, Enriquez's eight-year delay in adjusting his status resulted from a backlog of immigrant visas. Had Enriquez been allowed to adjust his status shortly after the VAWA self-petition was approved in 2000, he likely would have been able to meet the requirements of the cancellation statute.

A critical component of VAWA is the self-petitioning process at issue in Enriquez's case. Congress recognized that, prior to VAWA, only United States citizen or LPR spouses were allowed to petition the government for an immigrant spouse, which meant that an abusive "spouse maintain[ed] full control over the petitioning process" and could "withdraw the petition at any time for any reason." H.R. Rep. 103–395, at 25; *see Hernandez*, 345 F.3d at 838 (noting that Congress recognized that then-existing "[immigration] law foster[ed] domestic violence" (citing H.R. Rep. 103–395, at 26)). Therefore, Congress passed VAWA to allow immigrant battered spouses to "self-petition" for adjustment of status, in order "to prevent the citizen or [LPR abusive spouse] from using the petitioning process as a means to control or abuse [the immigrant] spouse." H.R. Rep. 103–395, at 25; *see* 8 U.S.C. §§ 1154(a)(1)(A)(iii)(I), (a)(1)(B)(ii)(I).

The VAWA self-petitioning process is twofold: first, the individual must file a petition (Form I-360); and second, if the petition is approved, the individual may then apply to adjust his or her status to LPR (Form I-485). *See* 8 U.S.C. § 1255(a). In other words, approval of the VAWA self-petition does not by itself adjust the petitioner's status to LPR; it merely authorizes the petitioner to apply for adjustment. *Id.* To protect this population from deportation while they await the adjustment of their status to LPR, Congress authorized undocumented immigrants with approved VAWA self-petitions—as well as their dependent children—to obtain deferred action and work authorization. *See id.* § 1154(a)(1)(D)(i)(IV), (a)(1)(K). Then, once VAWA beneficiaries adjust their status to LPRs, they may apply to become United States citizens, subject to the naturalization rules and timetables applicable to LPRs. *See generally id.* § 1427.

In sum, Congress created a program whereby undocumented survivors of domestic violence are placed on a path toward United States citizenship without having to rely on abusive partners for family-based immigration sponsorship. For all practical purposes, VAWA aims to bring these vulnerable immigrants out of the shadows and into the documented population in an effort to address an underlying factor enabling their victimization: their immigration status.

## III.

We are asked to decide in this appeal whether Enriquez was "admitted in any status" under 8 U.S.C. § 1229b(a)(2)— the cancellation of removal statute applicable to LPRs— when the government approved his mother's VAWA self-petition, which conferred a number of immigration benefits to Enriquez, including the ability to adjust his status to LPR.

To qualify for cancellation of removal, an LPR must have: (1) "been an [LPR] for not less than 5 years"; (2) "resided in the United States continuously for 7 years after having been *admitted in any status*"; and (3) "not been convicted of any aggravated felony." 8 U.S.C. § 1229b(a) (emphasis added). It is undisputed that Enriquez satisfies the first and third requirements of § 1229b(a) because he has been an LPR for at least five years and has not been convicted of an aggravated felony. It is also undisputed that Enriquez has continuously resided in the country for at least seven years. Therefore, the only issue on appeal is whether Enriquez has resided in the United States continuously for seven years after being "admitted in any status." *Id.* § 1229b(a)(2).

Enriquez's argument that approval of his mother's VAWA self-petition constitutes an "admission" under

§ 1229b(a)(2) is foreclosed by our precedent. In *Medina-Nunez v. Lynch*, we deferred to the BIA's narrow interpretation of the statute and adopted the view that the statutory definition of "admitted" under the Immigration and Nationality Act ("INA")—"the lawful *entry* of the [petitioner] into the United States after inspection and authorization by an immigration officer"—controls in this context. 788 F.3d 1103, 1105 (9th Cir. 2015) (per curiam) (quoting *Reza-Murillo*, 25 I. & N. Dec. 296, 297–300 (BIA 2010) (quoting 8 U.S.C. § 1101(a)(13)(A))). Application of this definition, which is limited to "something akin to passage into the United States at a designated port of entry," *Ramirez v. Brown*, 852 F.3d 954, 961 (9th Cir. 2017), forecloses any relief to Enriquez because he entered the country without inspection. *See also Negrete-Ramirez v. Holder*, 741 F.3d 1047, 1051 (9th Cir. 2014) ("The definition refers expressly to *entry into* the United States, denoting by its plain terms passage into the country from abroad at a port of entry.").

It is worth emphasizing that we deferred to this narrow construction by the BIA without much explanation, noting only that:

> It [was] reasonable for the BIA to apply the statutory definition of the term "admitted." Nothing in the statutory text, the BIA's cases, or our own cases precludes the BIA from relying on that definition.

*Medina-Nunez*, 788 F.3d at 1105. Without more, we abrogated our long-standing precedent in *Garcia-Quintero v. Gonzales*, where we held that the term "admitted" is not limited to a "physical entry and inspection." 455 F.3d 1006, 1016 (9th Cir. 2006). We then concluded that admission into

the Family Unity Program ("FUP")—a program which, similar to VAWA, allows undocumented immigrants within our borders to obtain temporary relief from deportation and work authorization while they await adjustment of their immigration status to LPR, *see* 8 U.S.C. § 1255a—was *not* an "admission" under the cancellation statute. *Medina-Nunez*, 788 F.3d at 1105 (overruling *Garcia-Quintero*, 455 F.3d at 1009 (explaining that FUP was "designed to help families stay together while the beneficiaries adjust to LPR status")). The practical consequence of our precedent is that LPRs like Enriquez, who physically entered the country without inspection but who Congress decided could transition to LPR status through programs such as VAWA or FUP, cannot be deemed "admitted" when they are accepted into such programs for purposes of meeting the seven-year continuous presence requirement of § 1229b(a)(2).

A strict application of the port-of-entry definition of "admitted" to the cancellation of removal statute is inconsistent with the statutory context and creates a loophole that Congress could not have possibly intended. Although we generally follow an "explicit definition" when Congress provides one, we do not do so when it is "not possible in a particular context." *Negrete-Ramirez*, 741 F.3d at 1053 (quoting *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)); *see, e.g.*, *Ramirez*, 852 F.3d at 961 (rejecting statutory definition because "the statutory context so dictates"). Indeed, it is axiomatic that when we construe a statute, our "analysis of the statutory language requires an assessment of the effect of these terms on the meaning of the provision as a whole." *Negrete-Ramirez*, 741 F.3d at 1051.

The cancellation of removal statute applicable to LPRs sets forth two separate and distinct requirements related to

the individual's "admission." The applicant must "(1) ha[ve] been . . . lawfully *admitted* for permanent residence for not less than 5 years," and "(2) ha[ve] resided in the United States continuously for 7 years after having been *admitted* in any status." 8 U.S.C. § 1229b(a)(1)–(2) (emphases added). Thus, the statute recognizes on its face that LPRs are approved to become LPRs *after* they first reside in the country in some other status. *See Garcia-Quintero*, 455 F.3d at 1016 ("Congress designed the dual requirement of a five-year legal permanent residency *and* seven-year continuous residence in any status . . . 'to clear up prior confusion and to strike a balance between the conflicting interpretations . . . by counting a limited period of time spent in non-permanent status while still requiring at least five years of permanent resident status.'" (quoting *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1028 (9th Cir. 2005), *overruled on other grounds by Holder v. Martinez Gutierrez*, 566 U.S. 583 (2012))).

Indeed, applying the port-of-entry definition to § 1229b(a)(2) renders the cancellation statute entirely unusable for LPRs who, like Enriquez, have continuously resided in the country for many years but who never *physically entered* the country with inspection or authorization. Therefore, such reading of the term "admission" creates a giant loophole in the statute to the detriment of the population of undocumented immigrants that programs like VAWA and FUP are designed to protect. Consistent with the well-established principle that we must avoid interpretations that "produce 'an absurd and unjust result which Congress could not have intended,'" *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)), we have previously departed from a strict application of the port-of-entry definition to avoid loopholes

in the INA, *see Ocampo-Duran v. Ashcroft*, 254 F.3d 1133, 1135 (9th Cir. 2001) (rejecting port-of-entry definition because otherwise the law would create "a loophole in the removal laws for [immigrants] who enter the country without inspection"); *see also In Re Rosas-Ramirez*, 22 I. & N. Dec. 616, 623 (BIA 1999) (same). Here, too, a departure is necessary to avoid a result contrary to Congress's objective "to forestall harsh results" for VAWA recipients. *Lopez-Birrueta v. Holder*, 633 F.3d 1211, 1216 (9th Cir. 2011) (quoting *Hernandez*, 345 F.3d at 840); *see Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (noting that statutory interpretation involves looking at a provision in the context of the entire scheme, including "statutes on the same subject" and the "objects and policy of the law" (quoting *Brown v. Duchesne*, 60 U.S. 183, 194 (1856))); *Ramirez*, 852 F.3d at 963 (interpreting the term "admission" under the adjustment of status statute "consistent with the purpose of [Temporary Protected Status ('TPS')]" and rejecting the port-of-entry definition under 8 U.S.C. § 1101(a)(13)(A)).

Recognizing "the absurdity of finding long-time [LPRs] who entered without inspection" to be ineligible for relief under the LPR cancellation statute, the BIA in *Matter of Reza-Murillo* crafted a "compelling" exception to the applicability of the port-of-entry definition: LPRs who entered without inspection may be considered "admitted" as of the day they obtained LPR status. 25 I. & N. Dec. 296, 299–300 (BIA 2010) (relying also on "the unique statutory language" pertaining to LPRs). We have also carved out this exception in our law. *See, e.g.*, *Fuentes*, 837 F.3d at 967 ("Fuentes, who entered the United States without inspection in 1996, was admitted in 2004, when he was granted [LPR] status.").

But this "compelling" exception is not much of an exception at all. Limiting the term "admitted" in § 1229b(a)(2) to the date that Enriquez became an LPR renders § 1229b(a)(1) entirely superfluous, because an LPR who has continuously resided in the country for seven years after becoming an LPR will *necessarily* have been an LPR for five years. *See* 8 U.S.C. § 1229b(a)(1)–(2) (requiring the petitioner to "(1) ha[ve] been . . . *lawfully admitted for permanent residence* for not less than 5 years" and "(2) ha[ve] resided in the United States continuously for 7 years after having been *admitted in any status*") (emphases added). Therefore, the statute demands a more expansive reading of the term "admitted" under § 1229b(a)(2). *See Romero-Ruiz v. Mukasey*, 538 F.3d 1057, 1062–63 (9th Cir. 2008) ("It is a well-established principle of statutory construction that legislative enactments should not be construed to render their provisions 'mere surplusage.'" (quoting *Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002))).

In light of this statutory scheme, I would hold that Enriquez was "admitted" and began accruing continuous presence under the LPR cancellation of removal statute when the government inspected and approved his mother's VAWA self-petition. The statute demands this result because an approved petition is the step that precedes attaining LPR status in the VAWA context, and for all practical purposes, approval of such petition mirrors an inspection at a physical port-of-entry. A petition is only approved after the government "investigat[es] the facts of [the] case" and "determines that the facts stated in the petition are true." 8 U.S.C. § 1154(b); *see* 8 C.F.R. § 2042(c)(2)(i) (noting that the agency will determine what evidence submitted with the petition "is credible and the weight to be given to that evidence"). VAWA self-

petitioners are therefore undoubtedly inspected and authorized by immigration authorities when their petitions are approved, even if they do not physically re-enter the country with inspection. *See Ramirez*, 852 F.3d at 960 (concluding that TPS beneficiary was "admitted" under adjustment of status statute, in part because "in practice, . . . the application and approval process for securing TPS shares many of the main attributes of the usual 'admission' process for nonimmigrants"); *but see Vasquez de Alcantar v. Holder*, 645 F.3d 1097, 1102–03 (9th Cir. 2011) (holding that a petitioner who entered the country without inspection but whose family-based visa petition was processed and approved was not "admitted" under the cancellation statute).

Finally, it is worth noting that to advance its position in the context of this case, the government does not dispute the BIA's conclusion that deferred action is not an admission because it is merely "an informal administrative stay of deportation exercised by the [government] in its discretion." *Compare Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1903 (2020).

Even if deferred action alone is not an admission, Enriquez correctly points out that an approved VAWA self-petition confers much more than a favorable exercise of prosecutorial discretion. Through VAWA—as with FUP—Congress categorically conferred a critical immigration benefit to its intended beneficiaries: the ability to adjust their undocumented immigration status to LPR. Under the INA, undocumented persons who entered the country without inspection are generally "inadmissible" and therefore ineligible for adjustment of status to LPR. *Compare* 8 U.S.C. § 1182(a)(6)(A)(i) (unlawful entrants are inadmissible), *with* 8 U.S.C. § 1255(a)(2) (admissible persons are eligible to adjust their status to LPR); *but see*

8 U.S.C. § 1255(i). By passing VAWA, Congress specifically created a waiver of such an inadmissibility bar for VAWA self-petitioners and their beneficiaries who entered the country unlawfully. *See* 8 U.S.C. § 1182(6)(A)(ii)(I) (unlawful-entrant inadmissibility bar "shall not apply to [a person] who demonstrates that—[he or she] is a VAWA self-petitioner"). In other words, VAWA sought to bring approved petitioners who entered the country unlawfully on equal footing with *lawful entrants*, in order to render them eligible for adjustment of status to LPR under the INA. *See* 8 U.S.C. § 1255(a). Thus, Congress's intent is clear: approved VAWA beneficiaries are similarly situated to persons inspected and authorized at a port-of-entry, without having to needlessly *re-enter* through a physical border to adjust their status to LPRs.

## IV.

In sum, the BIA's exceedingly limited reading of "admission" is unreasonable in light of the entire statutory scheme, particularly in the context of VAWA and its remedial objective. Our acquiescence to this construction has led to an absurd and unjust result that is inconsistent with the realities of our immigration system and congressional intent. But because "[b]inding authority must be followed unless and until overruled by a body competent to do so," *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1211 (9th Cir. 2016) (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001)), I agree that Enriquez's petition must be denied in light of our precedent.